# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| John T. Metcalf, and Lawrence Doppelt and Manny Doppelt, as Co-Trustees of the Frederick Doppelt Trust, derivatively on behalf of Eagle Bulk Shipping Inc., | **ECF CASE** <br><br> **CIVIL ACTION NO. 11-CV-3996-AKH** |
| Plaintiffs, | **MODIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| Sophocles N. Zoullas, Alexis P. Zoullas, Douglas P. Haensel, Jon Tomasson, Joseph M. Cianciolo, David B. Hiley, Thomas B. Winmill, Forrest E. Wylie, Alan S. Ginsberg, | |
| Defendants, | |
| and | |
| Eagle Bulk Shipping Inc., Nominal Defendant. | |

Plaintiff John T. Metcalf and Plaintiffs Lawrence Doppelt and Manny

Doppelt, as Co-Trustees of the Frederick Doppelt Trust (all such parties,

"Plaintiffs"), by their attorneys, make the following allegations based upon

information and belief, except as to allegations specifically pertaining to Plaintiffs and their counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    Plaintiffs bring this derivative shareholder action against Defendant Eagle Bulk Shipping Inc. ("Eagle Bulk Shipping" or the "Company") and individual members of its current and former board of directors and its officers (together with the Company, the "Defendants") for damages and to rescind actions taken by the Company, which constituted breaches of the fiduciary duty and waste.

## THE PARTIES

2.    (a) Plaintiff John T. Metcalf is a shareholder of Eagle Bulk Shipping and has been a shareholder continuously since December 2008.  Plaintiff resides in, and is a citizen of, the state of Maryland.

(b) Plaintiffs Lawrence Doppelt and Manny Doppelt are Co-Trustees of the Frederick Doppelt Trust (the "Trust"), which is and has been continuously since July 2005 a shareholder of Eagle Bulk Shipping.  Lawrence Doppelt and Manny Doppelt reside in, and are citizens of, Florida and possess the customary powers to hold, manage, protect and dispose of Trust assets.

3.    Nominal defendant Eagle Bulk Shipping is a holding company incorporated under the laws of the Republic of the Marshall Islands and headquartered at 477 Madison Avenue in New York, New York.  Its stock is listed

2

on NASDAQ and traded under the symbol "EGLE."  Eagle Bulk Shipping is engaged through its subsidiaries in the ocean transportation of dry bulk cargoes worldwide through the ownership and operation of dry bulk vessels.  The operations of the vessels are managed by a wholly-owned subsidiary of the Company, Eagle Shipping International (USA) LLC ("Eagle Shipping International"), a Republic of Marshall Islands limited liability company.  Each vessel is owned through a separately wholly-owned subsidiary of the Company.

4.     Defendant Sophocles N. Zoullas ("Sophocles Zoullas") is the Company's founder, and has served as the Company's Chief Executive Officer and Chairman of the Board of Directors since 2005.  Sophocles Zoullas also serves as the Chief Executive Officer and Chairman of the Board of Eagle Shipping International, and served as President of Eagle Shipping International from 2005 until June 16, 2010 when he resigned and was replaced by his brother Alexis P. Zoullas ("Alexis Zoullas").  Sophocles Zoullas resides in, and is a citizen of, the state of New York.

5.     Defendant Alexis P. Zoullas is a director of the Company, and has served as a director from his appointment to the board by the Company's board of directors on or about April 2007.  In addition to serving on the board, Alexis Zoullas served as Vice President of Eagle Shipping International, from the period on or about August 19, 2008 through June 16, 2010.  Effective June 16, 2010, Alexis

3

Zoullas was appointed President of Eagle Shipping International, replacing his brother Sophocles Zoullas. Alexis Zoullas resides in, and is a citizen of, the state of New York.

6.      Defendant Douglas P. Haensel ("Haensel") is a director of the Company, and has served since he was appointed by the board on October 6, 2005. Haensel serves on the Company's Audit Committee, Conflicts Committee, and is the Chairperson of the Company's Nominating and Governance Committee. Haensel resides in, and is a citizen of, the state of Michigan.

7.      Defendant Jon Tomasson ("Tomasson") is a director of the Company, and has served since he was appointed by the board on or about April 2007. Tomasson serves as Chair of the Company's Compensation Committee, and also serves on the Company's Conflicts Committee and Nominating and Governance Committee. Tomasson resides in, and is a citizen of, the state of Texas.

8.      Defendant Joseph M. Cianciolo ("Cianciolo") is a director of the Company, and has served as a director since December 2005. Cianciolo serves on the Company's Conflicts Committee, Compensation Committee and serves as the Chair of the Audit Committee. Cianciolo resides in, and is a citizen of, the state of Rhode Island.

9.      Defendant David B. Hiley ("Hiley") is a director of the Company, and has served as a director since 2005. Hiley serves on the Company's Audit

4

Committee and Nominating and Governance Committee.   Hiley resides in, and is a citizen of, the state of New Hampshire.

10.   Defendant Thomas B. Winmill ("Winmill") is a director of the Company, and has served as a director since May 2010.  Winmill serves on the Company's Compensation Committee and Nominating and Governance Committee. Wiley resides in, and is a citizen of, the state of New York.

11.   Defendant Forrest E. Wylie ("Wylie") was a director of the Company from 2007 through May 2010.  Wylie served on the Compensation Committee during 2008 and 2009, along with Cianciolo and Tomasson.  Wylie resides in, and is a citizen of, the state of Texas.

12.   Defendant Alan S. Ginsberg ("Ginsberg") is the Chief Financial Officer of the Company, and has been in that position since 2005.  Ginsberg resides in, and is a citizen of, the state of New York.

## JURISDICTION AND VENUE

13.   This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) in that it is a shareholder derivative action filed under rule 23.1 of the Federal Rules of Civil Procedure, in which the plaintiff shareholders are from Maryland and Florida and all of the defendants are citizens of either New York or states other than Maryland or Florida, and the matter in controversy exceeds the sum

or value of $75,000 exclusive of interests and costs.  This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

14.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, in the Southern District of New York.

## FACTUAL BACKGROUND

A.    The Company.

15.    Eagle Bulk Shipping was formed in 2005, and issued shares to the public in June 2005.  As of March 24, 2011, the Company had 62, 560,436 shares outstanding.

16.    The Company is engaged primarily in the ocean transportation of major and minor bulk cargoes, including iron ore, coal, grain, cement and fertilizer wordwide.  As of December 31, 2010, the Company operates 38 vessels exclusively in the "Supramax" class, which ranges in size from 50,000 to 60,000 dwt.  Under a "newbuilding" program, the Company is constructing an additional eight vessels, which are expected to be delivered in 2011.

17.    Eagle Bulk Shipping is a holding company, which owns each of its vessels through a separate wholly-owned subsidiary.  The Company's commercial and strategic management of its fleet is operated through Eagle Shipping

International, a wholly-owned Marshall Islands limited liability company, with principal offices in New York City.

18.    Management of the Company's fleet involves the following functions:

<u>Strategic management</u> -- locating, obtaining financing and insurance for, purchasing and selling vessels.

<u>Commercial management</u>  -- obtaining employment for the vessels and managing relationships with charterers.

<u>Technical management</u> -- managing day-to-day vessel operations, performing general maintenance, ensuring regulatory and classification society compliance, supervising maintenance, arranging hire of qualified officers and crew, training, travel and payroll, and ensuring that seafaring employees have qualifications and licenses.

Strategic and commercial management are handled by the Company's management team in New York City through Eagle Shipping International.  Technical management is provided by unaffiliated third party technical managers, whose performance is reviewed annually.  The Company also set up in-house technical management capability to establish a vessel management benchmark with external managers.

19.    The Company employs 46 shore-based personnel in its principal executive office in New York and its office in Singapore and 19 personnel on-site at various shipyards supervising the construction of new ships.  As of December 31, 2010, the Company employed a total of approximately 800 officers and seamen on the operating fleet of 38 vessels.

20.    Eagle Bulk Shipping's CEO, Chairman of the Board, and President is Sophocles Zoullas.  He is also the CEO and Chairman of the Board of Eagle Shipping International, the subsidiary that conducts the active functions of the Company's business and the company that is Sophocles Zoullas' employer under his employment contract.   Until recently, Sophocles Zoullas was also the President of Eagle Shipping International, but in June 2010, he resigned as President (but remained as CEO and Chairman) and promoted his younger brother Alexis Zoullas, who had been serving as Eagle Shipping International's Vice President for the preceding year and a half.

21.    In addition to Sophocles Zoullas, the Company's 2011 proxy statement lists only two other executive officers:  Alexis Zoullas, who serves as President of Eagle Shipping International and is Sophocles Zoullas' brother; and Alan S. Ginsberg, the Chief Financial Officer of Eagle Bulk Shipping.

B.    The Role of Kelso.

22.    The IPO Registration Statement issued in June 2005 when the Company sold shares to the public identified the "equity sponsor" of the Company as Kelso & Co., L.P. ("Kelso"), a New York based private investment firm founded in 1971.  Immediately prior to its public offering, the Company was 100% owned by Eagle Ventures LLC ("Eagle Ventures"), a Marshall Islands LLC, which was 92.6% owned by affiliates of Kelso and 7.4% owned by management and outside investors.

8

After the offering, 47% of the common stock remained in the control of Eagle

Ventures, which gave Kelso and its affiliates a 41% interest in the Company after

the IPO.

23.   At the IPO, the Company had five directors:  Sophocles Zoullas;

Michael B. Goldberg ("Goldberg"); Philip E. Berney ("Berney"); Frank J. Loverro

("Loverro"); and David B. Hiley.  Goldberg, Berney and Loverro, constituting a

majority of the board, were and continue to be Managing Directors at Kelso. Berney

did not remain on the board very long, resigning in December 2005 when he was

replaced by Defendant Cianciolo.

C.   <u>Kelso Departs and the Company Serves Interests of Directors and Officers.</u>

24.   By early 2007, the Kelso affiliates sold out of their beneficial

ownership interests in the Company.  At that point, none of Kelso, its subsidiaries,

individuals associated with Kelso, or Eagle Ventures had any material interest in the

Company.

25.   In April 2007, shortly after Kelso sold out of its ownership interest in

the Company, Kelso's affiliates, Goldberg and Loverro resigned from the

Company's board of the directors.  They were replaced by Jon Tomasson and

Sophocles Zoullas' younger brother, Alexis Zoullas, (who was not an executive

officer at the time).

26.    After Kelso ended its relationship with the Company, there was a dramatic change in how the Company was operated.  It became an entity that was operated primarily to benefit the officers and directors rather than to increase value for shareholders.  This shift in focus was manifested in a number of ways, including:

- huge awards by the directors of their own compensation in a manner that violated the Company bylaws and the governing Marshall Islands corporate statute;

- huge awards of executive compensation and the execution of a one-sided employment agreement in favor of the CEO awarded by a conflicted board of directors in a *quid pro quo* arrangement with the executive officers;

- the hiring and promotion of Alexis Zoullas, in a manner that exacerbated the sudden and exponential rise in executive compensation, with little to no business purpose;

- the suspension of the Company's dividend, an essential element of the Company's business plan, in order to fund the outsized director and officer compensation payments; and

- the formation by Kelso and Sophocles Zoullas of Delphin Shipping LLC, a new company that competes directly with Eagle Bulk Shipping, while using Company resources and executive officers to run Delphin's business.

27.    These events transformed the Company from a corporation existing for the purpose of increasing shareholder value into one that funds the outsized compensation and other business interests of the Zoullas family and the Company's directors.  Not surprisingly, with this shift in management, the Company suffered

major hits to its profitability and its ability to continue as a going concern has been put in jeopardy.

D.    The Rise in Director and Executive Compensation.

28.    With the departure of Kelso, the directors of the Company began rewarding themselves and the executive officers immense sums of money.

29.    In 2006, while Kelso affiliates Goldberg and Loverro were directors of the Company, director compensation was as follows:  Michael W. Mitchell - $40,000; Cianciolo - $50,000; Haensel - $40,000; Hiley - $40,000 (Goldberg and Loverro didn't receive any director compensation).  These awards were supplemented with option awards and other cash payments paid on "dividend equivalent rights" held by the directors, which entitled them to receive a dividend equivalent payment each time the Company paid dividends to shareholders. Accordingly, with the addition of these dividend equivalent payments, total director compensation in 2006 was $73,438 per director (with the exception of Cianciolo, who earned $91,796).

30.    Similarly, in 2007, the year that the Kelso directors resigned, annual director fees did not exceed $65,000 per director, and with options and dividend equivalent payments, director compensation did not exceed $117,000 per non-employee director.

11

31.     By 2008, however, directors changed the manner in which they paid themselves.  The new method added a new component to director compensation.  In addition to receiving a fixed salary (as well as options and dividend equivalent payments), in 2008 the Compensation Committee of the board began paying directors for each board meeting and committee meeting attended.

32.     The new method resulted in much greater overall compensation.  It also violated the Company's Bylaws.  Section 12 of the Bylaws provides that: "The directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors *or* a stated salary for service as director, payable in cash or securities. … Members of special or standing committees may be allowed like compensation for service as committee members" (emphasis added).  Accordingly, pursuant to the Bylaws, the directors were not permitted to receive compensation comprised of a *combination* of per meeting fees and stated salaries (for their board service or committee service), but were limited to one of those two alternatives.  Nor were the directors permitted under the Bylaws to receive compensation in the form of options, dividend equivalent payments or other incentive compensation.

33.     Furthermore, the director compensation decisions in 2008, 2009, and 2010, were made by a Compensation Committee, rather than the board itself, and thus, violated the corporate statute that governs the Company.  Pursuant to Section

12

57 of the Marshall Islands Business Corporations Act, "no such committee [of the board of directors of a Marshall Islands corporation] shall have the authority as to … the fixing of compensation of the directors for serving on the board or on any committee." The Compensation Committee, thus, had no authority to set director compensation, but did so anyway.

34.     In 2008, each non-employee director received a cash retainer of $70,000 and a payment of $2,000 for in-person attendance at each board meeting, $1,500 for attendance at each telephonic board meeting; $1,500 for attendance in-person at each committee meeting; and $1,000 for attendance at each telephonic committee meeting. Additional retainers for serving as Committee Chair were added to those amounts:  the Chair of the Audit Committee received $20,000; Chair of Nominating and Governance Committee received $5,000; and Chair of the Compensation Committee received $10,000. In addition, the directors received dividend equivalent payments ranging of between $30,000 - $40,000 and stock awards of $101,400 each. Accordingly, in 2008 total non-employee director compensation was as follows:  Cianciolo - $303,234; Hiley - $259,566; Haensel - $225,566; Tomasson - $287,234; Wylie - $260,234. Information concerning the amounts paid to each of the directors and officers was first disclosed in the Company's proxy statement issued shortly before the shareholder meeting in April 2009.

35.     In 2009, the Company continued to pay a combination of salaries and per meeting fees to increase director compensation, but decided to increase these amounts again.  The per director cash retainer was increased from $70,000 to $95,000; board meeting fees (whether telephonic or in-person) were increased to $3,000; committee meeting fees (whether telephonic or in-person) were increased to $2,500; retainer for the Audit Committee Chair was increased to $30,000; retainer for the Nominating and Governance Committee Chair was increased to $20,000; retainer for the Compensation Committee Chair was increased to $25,000.  And a new Conflicts Committee was formed that year, and each Committee member was paid $65,000.  In addition, the directors awarded themselves stock awards of $110,170 each.  Accordingly, overall compensation in 2009 to non-employee directors was as follows: Cianciolo - $507,531; Hiley - $256,670; Haensel - $398,031; Tomasson - $491,531; and Forrest E. Wylie ("Wylie") - $340,170.

36.     In 2010, the directors used the same inflated method to pay themselves as they had in 2009, but their option awards were increased to $149,259 per director. Accordingly, overall compensation in 2010 to non-employee directors was as follows:  Cianciolo - $482,759; Hiley - $336,259; Haensel - $430,259; Tomasson - $475,259; Wylie - $80,299 (serving only for part of the year); Winmill - $112,000 (replacing Wylie and serving only for part of the year).

14

37.    In 2008, 2009 and 2010, the director compensation reached levels that were generally three to four times the compensation paid in 2006 and in some cases were up to ten times as much.  This occurred both because of the new method, improper under the bylaws, used to calculate compensation and because of the excessive number of meetings that the board and its committees decided to hold.  In 2010 the board met 20 times; the Audit Committee met 7 times; the Compensation Committee met 24 times; the Conflicts Committee met 2 times; and the Nominating and Governance Committee met 9 times.  In comparison, in 2006, the board met 6 times; the Audit Committee met 5 times; the Compensation Committee met one time; the Nominating and Governance Committee met one time; and the Conflicts Committee didn't exist.  The responsibilities and duties of the directors did not change during this short period, but they were paid a multiple of their prior fees for performing the same tasks.

38.    Hand in hand with the extraordinary rise in director compensation came skyrocketing executive compensation awards, bearing no relationship to Company performance, which was at its worst during this same period.

39.    The process of awarding executive compensation, which was set by the Compensation Committee and ratified by unanimous consent of the board, purported to be independent, but was not.  Beginning in 2008, management and directors had a *quid pro quo* arrangement, in which the directors paid management excessive sums

at the direction of Sophocles Zoullas, and the directors similarly awarded themselves dramatic pay increases, both by charging excessive rates and by holding an excessive number of meetings. Through this *quid pro quo* arrangement, the officers did not object to the dramatically increasing director fees, because in return they were paid excessive compensation, and vice versa. Moreover, as explained in the 2011 proxy statement, the Committee "review[ed] and approve[ed] the recommendations of [Sophocles Zoullas] regarding compensation and incentive plans of other named executive officers." Thus, instead of benchmarking compensation or linking it to performance targets in a manner that would serve the interests of the Company, the Compensation Committee approved the recommendations of Sophocles Zoullas as to the compensation of his brother Alexis Zoullas and Ginsberg, and those recommendations in turn served as a threshold for Sophocles Zoullas' own far higher compensation.

40.    In order to increase their fees and as part of the *quid pro quo*, the Compensation Committee met excessively. In 2010, merely for serving on this committee, the Committee members received $60,000 (meeting 24 times) and the Chair received $85,000; in 2009, the Committee members received $100,000 (meeting 40 times) and the Chair received $125,000; in 2008, the Committee met 30 times (but because fees depended on whether or not committee meetings were held

in person or telephonically, committee compensation cannot be calculated accurately from the publicly available information).

41.    The frequency of the Company's Compensation Committee meetings can be compared to that of its competitor in order to quantify the extent to which the Company's Compensation Committee met excessively for the purpose of increasing the fees to its members.  Genco Shipping & Trading Limited ("Genco"), is a New York City headquartered dry bulk shipping company incorporated in the Marshall Islands that, unlike the Company, benchmarked its executive compensation to comparable companies and used key financial measurements to inform compensation decisions.  Yet Genco's compensation committee did not meet nearly as often as the Company's Compensation Committee.  Genco's compensation committee met 5 times in 2010, 3 times in 2009, and 4 times in 2008. Eagle Bulk Shipping's compensation committee met 5 to 13 times as often, for the obvious purpose of enriching itself, the rest of the board, and the three executive officers, without any consideration of value to the Company or its shareholders.

42.    In 2008, Sophocles Zoullas was awarded a total of $35,788,323, comprised of $875,000 salary, $4,000,000 cash bonus, $24,249,990 stock awards; and $6,663,333 other compensation (including "special cash incentive" of $4,000,000).

43.    In 2009, Sophocles Zoullas was awarded a total of $8,582,112, comprised of $900,000 salary, $3,750,000 cash bonus, $3,911,400 stock awards, and $20,712 other compensation.

44.    In 2010, Sophocles Zoullas' compensation totaled $8,347,867, comprised of $900,000 salary, $5,450,000 cash bonus, $1,968,000 stock awards, and $29,867 other compensation.

45.    Both Zoullas brothers benefitted from excessive compensation during that period. Alexis Zoullas, who first joined the company in 2007, received a series of quick promotions - first on August 19, 2008, when he was promoted to Eagle Shipping International's Vice President and then in 2010 when he was promoted to Eagle Shipping International's President. These promotions gave him a better title and ever greater compensation, but Sophocles Zoullas remained in the top position and, other than title changes, there were no changes in management. Thus, there was no business purpose for the promotions, and as a result of the promotions the Company now pays both brothers excessive sums to perform the duties that were previously performed by Sophocles Zoullas alone.

46.    Moreover, Alexis Zoullas' promotions were made by his own brother Sophocles Zoullas, as Chairman, CEO and President of Eagle Shipping International,  and Sophocles also set Alexis' skyrocketing compensation through recommendations to the Compensation Committee and the board.

47.    In 2008, Alexis Zoullas was paid $3,833,499, comprised of $203,958 salary (representing a pro-rated base salary of $500,000); a $500,000 cash bonus; $2,940,600 stock awards; and $188,941 other compensation (including a "special cash incentive").

48.    His 2009 compensation was $2,541,600, comprised of $650,000 salary, $1,375,000 bonus, and $516,000 stock awards.

49.    In 2010, Alexis Zoullas was paid $2,578,000, comprised of $650,000 salary, $1,500,000 bonus, $418,200 stock awards, and $9,800 other compensation.

50.    The third executive officer of the Company, Alan S. Ginsberg, Chief Financial Officer, was also awarded excessive compensation during the same period, receiving total compensation of $1,357,400 in 2010; $1,345,200 in 2009; and $1,445,076 in 2008, with a large component in cash.  Given the Company's size and relative profitability, Ginsberg's compensation was far in excess of that paid by the Company's competitors.

51.    For the three-year period 2008 through 2010, total executive compensation was approximately $65.8 million and total director compensation was approximately $6.4 million; while the combined net income for that three-year period was approximately $121.8 million.  Total executive and director compensation, thus, was close to 60% of net income during that period.  These compensation numbers are especially oversized in relation to the size of the

19

Company.  As of December 31, 2010, stockholders' equity was valued at $669 million.

52.     Although the Compensation Committee examined all available compensation information concerning Eagle Bulk's competitors, it asserted that there was not sufficient information to permit a meaningful benchmark assessment, when in fact the Committee knew that the Company's competitors were benchmarking compensation and paid their directors and officers proportionately much less.  Thus, the Compensation Committee and the board violated their fiduciary duties and wasted corporate assets by failing to set compensation competitively.

53.     The following chart compares the size and profitability of Eagle Bulk Shipping to Genco, based on each company's 2011 definitive proxy statement on Form 14A and annual report on Form 10-K for the year ended 2010.  It shows that Genco is almost five times as profitable, and when measured by the number of vessels in operation, Genco is 25% larger.  Yet, Eagle Bulk Shipping's general and administrative expenses (encompassing largely director and officer compensation) are 30% more than Genco's.

| Company | Revenue | General & Admin Expense | Net Income | # Vessels |
|---|---|---|---|---|
| Eagle Bulk Shipping | $265,036,066 | $40,029,261 | $26,844,650 | 38 |
| Genco | $448,687,000 | $29,081,000 | $147,409,000 | 49 |

54.   The following chart compares the director compensation paid by Genco and Eagle Bulk Shipping in 2010.  It shows that Eagle Bulk Shipping's total payment of director fees was nearly four times that of Genco's.

| Company | Avg Fee Per Director | Option Award | Avg Fee With Option Award | Total Director Fees |
|---|---|---|---|---|
| Eagle Bulk Shipping | $263,960 | $149,259* | $406,248 | $2,031,238 |
| Genco | $60,500 | $55,125 | $115,625 | $578,125 |

*Except Wylie was awarded $114,403 for a partial year.

55.    The following charts compare executive compensation paid by Genco and Eagle Bulk Shipping in 2008, 2009, and 2010.

Eagle Bulk Shipping Executive Compensation

| Officer | Year | Salary | Bonus and Other Comp | Stock Awards | Total |
|---|---|---|---|---|---|
| Sophocles Zoullas, CEO | 2010 | $900,000 | $5,479,867 | $1,968,000 | $8,347,867 |
| | 2009 | $900,000 | $3,770,712 | $3,911,400 | $8,582,112 |
| | 2008 | $875,000 | $10,663,333 | $24,249,990 | $35,788,323 |
| Alexis Zoullas, President | 2010 | $650,000 | $1,509,800 | $418,200 | $2,578,000 |
| | 2009 | $650,000 | $1,375,000 | $516,600 | $2,541,600 |
| | 2008 | $203,958* | $688,941 | $2,940,600 | $3,833,499 |
| Alan Ginsberg, CFO | 2010 | $450,000 | $759,800 | $147,600 | $1,357,400 |
| | 2009 | $450,000 | $600,000 | $295,000 | $1,345,200 |
| | 2008 | $275,282 | $1,169,794 | | $1,445,076 |

*Employment as executive officer began on August 19, 2008.

Genco Executive Compensation

| Officer | Year | Salary | Bonus and Other Comp | Stock Awards | Total |
|---|---|---|---|---|---|
| Robert Buchannan, President | 2010 | $450,000 | $714,700 | $366,250 | $1,530,950 |
|  | 2009 | $400,000 | $405,000 | $335,850 | $1,140,850 |
|  | 2008 | $350,000 | $450,000 | $181,050 | $981,050 |
| Peter Georgiopoulos, Chairman | 2010 | $0 | $63,000 | $10,601,625^ | $10,664,625 |
|  | 2009 | $0 | $35,000 | $62,325 | $97,325 |
|  | 2008 | $0 | $35,000 | $5,252,625# | $5,287,625 |
| John C. Wobensmith, CFO & President of Baltic Trading Ltd. (subsidiary) | 2010 | $450,000 | $1,514,700 | $2,877,000** | $4,841,700 |
|  | 2009 | $400,000 | $914,700 | $1,119,500 | $2,434,200 |
|  | 2008 | $350,000 | $1,013,800 | $603,500 | $1,967,300 |

^ Includes grant of restricted shares for year ended December 31, 2009, having a grant date fair value of $1,717,500 and special grant of restricted shares of subsidiary's common stock in connection with subsidiary's IPO, having a grant date fair value of $5,012,000.

# Includes grant of restricted shares for year ended December 1, 2007 having a grant date fair value of $4,191,000.

** Includes special grant of restricted shares of subsidiary's common stock in connection with subsidiary's IPO, having a grant date value of $1,512,000.

56.     The following chart is a comparison of the total salaries paid out by Eagle Bulk Shipping as compared to Genco, and a comparison of the bonuses and other compensation (apart from stock and option grants) for the years 2008, 2009 and 2010.  The chart shows that in each year Eagle Bulk Shipping's total executive officer compensation (not including equity grants) was 3-4 times as great as Genco's.

| Company | 2010 Tot. Salary | 2010 Tot. Bonus & Other Non-Equity | 2009 Tot. Salary | 2009 Tot. Bonus & Other Non-Equity | 2008 Tot. Salary | 2008 Tot. Bonus & Other Non-Equity |
|---|---|---|---|---|---|---|
| Eagle Bulk Shipping | $2,000,000 | $7,749,467 | $2,000,000 | $5,745,712 | $1,354,240 | $11,592,068 |
| Genco | $900,000 | $2,292,400 | $800,000 | $1,354,700 | $700,000 | $1,498,800 |

57.     Although the information required to be disclosed by SEC rules applicable to foreign-based dry bulk shipping companies is different from information required to be disclosed by a U.S.-based company, it is still possible to obtain information from SEC filings to compare overall general and administration expenses (which include director and officer compensation) as well as overall cash compensation.

58.    The chart below compares 2010 revenues, net income, and general and administrative expenses (which includes director and officer compensation) of Eagle Bulk Shipping with its foreign-based competitors, DryShips Inc. ("DryShips"), Excel Maritime Carriers Ltd. ("Excel"), and Diana Shipping Inc. ("Diana Shipping").  The chart shows that when comparing Eagle Bulk Shipping to all of its competitors, it has by far the highest percentage of general and administrative expenses to net income and the highest percentage of general and administrative expenses to total revenues.

2010 Comparison of General and Administrative Expenses to Foreign Competitors

| Company | Total Revenues | Net Income | General and Admin Expenses | G&A as a % Net Income | G&A as a % of Revenue |
|---|---|---|---|---|---|
| Eagle Bulk Shipping | $265,036,066 | $26,844,650 | $40,029,261 | 148% | 15% |
| DryShips | $859,745,000 | $190,450,000 | $87,264,000 | 46% | 10% |
| Excel | $685,647,000 | $258,826,000 | $35,748,000 | 14% | 5% |
| Diana Shipping | $275,448,000 | $127,869,000 | $25,347,000 | 20% | 9% |

59.    More specifically, as the following chart shows, in 2010 Eagle Bulk Shipping's cash compensation of its directors and officers was the highest among its foreign competitors and as a percentage of net income, Eagle Bulk Shipping's cash compensation was more than 7 times the next highest foreign competitor.

25

| Company | Net Income | Aggregate Non-Executive Director Cash Compensation | Aggregate Executive Director Cash Compensation | Total Director and Officer Cash Compensation | % Cash Comp. to Net Income |
|---|---|---|---|---|---|
| Eagle Bulk Shipping | $26,844,650 | $1,319,799 | $11,019,799 | $12,339,598 | 45.5% |
| DryShips | $190,450,000 | $700,000 | $11,000,000 | $11,700,000 | 6.2% |
| Excel | $258,826,000 | $300,000 | $4,100,000 | $4,400,000 | 1.6% |
| Diana Shipping | $127,869,000 | $400,000 | $1,400,000 | $1,800,000 | 1.4% |

60.     The Compensation Committee purported to engage Steven Hall & Partners ("Steven Hall") as a compensation consultant to provide the Committee with comparative market data.  Steven Hall also advised Genco, which unlike Eagle Bulk Shipping, benchmarked its compensation to comparable companies and factored in key financials.  In contrast to Genco, the executive and director compensation awarded at Eagle Bulk Shipping was not benchmarked and far exceeded compensation awarded at comparable companies, given the Company's relative size and performance.  The Company's purported reason for not benchmarking -- that "the Committee does not believe that it has sufficient information to permit a meaningful benchmark assessment" – was false.  Accordingly, one or all of the following apply: (1) the Compensation Committee did not in fact rely on the Steven Hall, (2) its reliance was not in good faith; (3) because

comparable compensation and market data was material, reasonably available, and obviously showed that the Company's compensation was excessive, the Compensation Committee and board's failure to consider it was grossly negligent, regardless of the Steven Hall's advice or lack of advice; and (4) the Committee and board made a decision that was so unconscionable as to constitute waste or fraud.

E.   Sophocles Zoullas' 2008 Employment Agreement.

61.   On June 19, 2008, a new Employment Agreement was executed between Eagle Shipping International and Sophocles Zoullas ("2008 Employment Agreement") to replace an earlier agreement executed in 2005 that was expiring ("2005 Employment Agreement").

62.   The terms of the 2008 Employment Agreement are much more favorable to Mr. Zoullas than the 2005 Employment Agreement, an agreement that was formed when Kelso was an investor in the Company; the revisions from the earlier agreement eliminated virtually all of the benefit to the Company of having an employment agreement with its CEO.

63.   The Agreement allows Mr. Zoullas to "voluntarily terminate his employment without Good Reason and such termination [is] not deemed to be a breach of [the] Agreement."  There is no corresponding right to the Company to terminate at will, without a substantial penalty.

64.     Under the 2008 Employment Agreement, not only is there no penalty to
Mr. Zoullas if he quits, he would actually benefit by quitting in any year in which he
might expect a reduced bonus from the previous year, whether the reduction arises
from his poor performance or poor performance of the Company.  Under Section
4(b) of the agreement, if he quits, not only is he entitled to unpaid earned salary,
bonus, and expenses (*i.e.*, accrued benefits), but he is also entitled to an *additional
bonus for the year that he quits* (calculated as a prorated average of the prior two
years' bonuses).  In effect, the Company has agreed to pay Mr. Zoullas an unearned,
undeclared bonus as a reward for quitting.  By contrast, under the 2005 Employment
Agreement, Mr. Zoullas was not entitled to any bonus for the year he quit.  This
provision fosters a perpetual bonus cycle, because a reduction would give Mr.
Zoullas an incentive to leave.

65.     The agreement is completely one-sided.  Under Section 4(a) of the 2008
Employment Agreement, if the Company were to terminate Sophocles Zoullas
without cause (or if he were to terminate for "Good Reason"), he would receive all
of the above payments, plus another bonus equal to *two times his average two-year
base salary and bonus* and immediate vesting of his equity awards.   By contrast,
the earlier 2005 Employment Agreement provided that on a termination without
cause, severance would be equal to one year's base salary (and no bonus).  Given

Mr. Zoullas' current salary of $900,000 and bonus of $5,450,000, the difference between the two arrangements is immense.

66.     To make matters worse, the 2008 Employment Agreement provides in Section 3(c)(i) that "Good Reason" for Sophocles Zoullas to resign (and receive a three-fold bonus) includes: "a material diminution" of his base salary.  Unlike the 2005 Employment Agreement, there is no exception if the reduction was part of a "general salary reduction or other concessionary arrangement affecting all employees or affecting the group of employees of which Mr. Zoullas is a member." Again, this clause commits the Company to a never-ending cycle of excessive compensation, regardless of the Company's financial condition, while Mr. Zoullas may quit at any time with no penalty.

67.     Accordingly, the 2008 Employment Agreement, which grants Mr. Zoullas the unilateral right to quit at will without penalty and imposes punitive costs on the Company if it terminates Mr. Zoullas at will, is so one-sided that no reasonable person would agree to it on behalf of the Company.

F.     Suspension of the Dividend, Falling Stock Price, and Weakening Financials.

68.     The excessive compensation and rewards paid to directors and executive officers of the Company in 2008, 2009, and 2010 bore no relationship to the performance of those individuals.  During that period, the stock price declined dramatically beyond Eagle Bulk's own peers in the industry.  In May 2008, the

Company's stock traded at $36.24; currently, it trades around $2.51, a drop of over 90%.

69.     Furthermore, throughout the period from 2008 through 2010 the Company consistently underperformed its peers, as measured by the "Dry Index," a peer group stock performance index consisting of Dryships, Diana Shipping, Excel, Navios Maritime Holdings, Inc., and Genco.  The Company's 2010 Form 10-K reports that, assuming an investment of $100:  (i) as of December 31, 2010, the Dry Index was at 99.09, while the Company was at 86.39; (ii) as of December 31, 2009, the Company was at 82.55, while the Dry Index was at 117.88; (iii) as of December 31, 2008, the Company was at 95.93, while the Dry Index was at 107.65.  Thus, while the Company underperformed its peers, nonetheless it paid its directors and officers far in excess of its peers, effectively paying out excessive rewards for substandard performance.

70.     In addition, in the fourth quarter of 2008, the Company's directors decided to suspend the dividend to shareholders purportedly "to increase cash flow, optimize financial flexibility and enhance internal growth."  Yet at the same time, they awarded themselves and the executives huge compensation packages.

71.     The decision to suspend dividends was unfair to shareholders, and sharply contrasts with the dividend policy described in the IPO Registration Statement, which was to pay quarterly dividends "in amounts that are substantially

equal to our available cash from operations during the previous quarter less any cash reserves for drydockings and working capital" and "to manage and expand our fleet in a manner that enables us to pay attractive dividends to stockholders."

72.    The decision in 2008 to suspend this fundamental Company policy was obviously intended to serve the directors and officers rather than the Company or its shareholders, because in 2009 and 2010, cash flow was still sufficient to pay at least some dividends, even with the enormous diversion of the Company's cash to its directors and officers.  Net cash provided by operating activities during the years ended December 31, 2010 and 2009 was $94,339,830 and $90,524,861, as compared to $109,535,918 at the end of 2008.  The combined cash flow in 2009 and 2010 was thus nearly $185,000,000 (approximately 1.7 times the cash flow in 2008), yet the Company paid no dividends in that two-year period, failing to abide by its original mandate.

73.    While the Company richly compensated its executives and directors with funds it withheld from stockholders during this period, by August 4, 2009, the Company defaulted on its covenants under a credit facility with its primary lender, and was no longer meeting the minimum security covenant, minimum net worth covenant, and minimum interest coverage ratio covenant.  As a result, the Company was forced to modify the credit facility in a manner that changed the covenants, and increased costs to the Company.  Currently, the lender is in dispute with the

Company about whether the original covenants are once again in force.  The lender has asserted that the original covenants are in force and that the Company is in default.

74.    In the Company's 10-Q filed with the Securities Exchange Commission on May 10, 2011, it reported that if the lender were correct, the Company would be in default under its credit facility as of March 31, 2011, causing the full loan amount to become due, which "could lead to substantial doubt about [the Company's] ability to continue as a going concern."  This mismanagement of the Company's debts had no downward impact on executive compensation, but had a severe negative impact on the Company and its shareholders.

75.    Accordingly, during the period from 2008 through the present, the shareholders have suffered significant losses in both the stock price of their shares and their dividend income stream, and now face a significant possibility that the Company will not survive.  At the same time, the directors and executive officers have taken shareholder money for themselves, in no relationship to the value, if any, that the directors and executive officers have added to the Company and far in excess of the compensation paid to directors and officers by the Company's competitors.  Moreover, while Sophocles Zoullas' compensation has been increasing rapidly, his responsibilities were decreased as a result of the promotions of his brother Alexis Zoullas during this period, the effect of which is the Company's

payment of two outsized compensation packages for a job that used to be performed by Sophocles Zoullas alone. Further, as alleged below, Sophocles no longer devotes his full time to the Company, but is now devoting a substantial part of his time working for a competitor that he has established.

76.     These actions of the board and management of the Company from 2008 through the present show that the Company has been and continues to be run to benefit the directors and executive officers rather than shareholders.

G.     Sophocles Zoullas and Kelso Form Delphin, Eagle Bulk's Competitor.

77.     During the same period that the board handed over large sums to Company executives and in particular to Sophocles Zoullas, it allowed Sophocles Zoullas to start up a competing business through Delphin Shipping LLC ("Delphin"), a Marshall Islands limited liability company formed in 2009 by Mr. Zoullas together with his previous "partner" and original sponsor of the Company – Kelso.

78.     Delphin was "formed for the purpose of acquiring dry bulk vessels and engaging in other activities in the shipping sector." Sophocles Zoullas serves as non-executive chairman of Delphin. Goldberg and Loverro, principals of Kelso, who resigned from Eagle Bulk Shipping's board in 2007, have returned to the shipping business, by serving as directors of Delphin. Instead of purchasing the stock of the Company to invest in the dry bulk shipping business managed by

Zoullas, Kelso and Sophocles Zoullas formed their own private company to "take advantage of opportunities in the shipping sector."

79.    Not only does Delphin compete with the Company in the Company's business, but it also uses the Company's resources to operate.  On August 4, 2009, the Company entered into a management agreement (the "Management Agreement") with Delphin.  Pursuant to the Management Agreement, the Company is responsible for all commercial and technical supervisory management services for the vessels of Delphin as it acquires them.  Essentially, the Management Agreement delegates to the Company all aspects of chartering the ships and running them.  Accordingly, using the Company's resources, Sophocles Zoullas is able to run Delphin, his competing business, for the benefit of himself and Kelso, on an ongoing basis, at a cost far less than the Company incurs to conduct its own operations.

80.    Not surprisingly, the negotiation of the Management Agreement was fraught with conflicts.  The contact for Delphin is listed as Sophocles Zoullas, and the same law firm is listed as representing both Delphin and the Company.  The result of that negotiation is a Management Agreement that is unfair to the Company.

81.    The fees to be paid to the Company by Delphin under the Management Agreement are vastly insufficient compensation for the use of the Company's resources.  When compared to the Company's own per ship expenses, as reflected in general and administrative expenses, the fees to be paid by Delphin to the Company

34

are a mere 16% of the per ship expenses the Company incurs for the same services. Moreover, the fees are reduced in the event Delphin's vessels are "laid-up" (not employed), thus, unfairly allocating the downside risk of Delphin's business to the Company.

82.    The Management Agreement also establishes a management conflict that is unfair to the Company on a continuing basis. It allows Sophocles Zoullas to wear two hats – representing both Delphin and the Company – when charter business is allocated among ships owned by each of the two companies and when possible ship purchases are considered. Although the Management Agreement purports to address this issue, by including a minimal right of first refusal to the Company, Mr. Zoullas is in charge of both companies, putting the Company and its shareholders at risk that he will favor Delphin.

83.    Sophocles Zoullas' interest in Delphin, and role in operating both Delphin and the Company, is inconsistent with his fiduciary duty of loyalty.

84.    Sophocles Zoullas' formation and operation of Delphin also violates his obligations under the 2008 Employment Agreement. Section 2(a)(ii) of the 2008 Employment Agreement required Mr. Zoullas to "devote substantially all of his business time and attention to the business and affairs of [Eagle Shipping International] and [Eagle Bulk Shipping]." Section 2(a)(i) also required him to undertake the "duties and responsibilities as are commensurate with [the position of

Chief Executive Officer of Eagle Shipping International]." While there are limited exceptions in the 2008 Employment Agreement to Zoullas' time commitment to the Company, none of them permit him to operate a competing business.

85.    The directors of the Company abrogated their duties to act faithfully towards the Company in connection with Delphin and the Management Agreement. The Delphin arrangement was simply a justification for the directors to pump up their fees even more through the creation of the Conflicts Committee, which paid each of its members $65,000 in 2010, even though it met only twice. Thus, the Conflicts Committee is itself conflicted.

H.    The Board Replaces the Company's Long-Time Auditor.

86.    On February 24, 2011, the Company announced that it had selected a new auditor and dismissed Ernst & Young LLC effective with the completion of the audit for the fiscal year ended December 31, 2010. Ernst & Young LLC had been the Company's auditor since the Company's inception in 2005.

87.    The Company provided no explanation for dismissing Ernst & Young LLC. Nor did it explain why Ernst & Young's fees had more than doubled in 2010 as compared to the previous year, due to additional and apparently necessary "assurance and related services fees" in connection with its audit. The circumstances of the dismissal of Ernst & Young, unidentified by the Company, in light of the additional work Ernst & Young deemed necessary to perform in

connection with the audit and the conflicted nature of the Company's arrangement with Delphin, suggests that the Defendants are obscuring even more inappropriate behavior.

I.   The Adjournment of the Shareholder Meeting.

88.   Each year since the Company went public, it has held its annual shareholder meeting in New York City.

89.   On April 7, 2011, the Company filed with the Securities Exchange Commission its definitive proxy statement on Schedule 14A announcing its 2011 annual meeting to be held in New York City at 10:00 a.m. on May 19, 2011.

90.   The proxy statement listed four specific items that shareholders would be asked to vote on at the 2011 annual meeting:

- To elect two Class III Directors to the Board of Directors;

- To ratify the appointment of PricewaterhouseCoopers LLP as the Company's auditor for fiscal year 2011

- To approve, by non-binding vote, executive compensation;

- To approve, by non-binding vote, the frequency of executive compensation votes (shareholders were asked to select a frequency of one, two or three years)

91.   The proxy statement issued by the Company and its board failed to disclose that both the directors and the officers of the Company are compensated at rates that vastly exceed the Company's competitors.  While the 2011 proxy statement and past proxy statements have stated that the board reviews the

37

compensation practices of its competitors, the Company has never told its shareholders that its board and its officers are compensated at rates that are several times its competitors.  Furthermore, the 2011 proxy falsely stated that the Company did not have sufficient information to permit a meaningful benchmark assessment, when the board and Compensation Committee knew that the Company's competitor, Genco, which retained the same compensation consultant as the Company, did in fact benchmark its compensation and relied on key financial measures, and that Genco incurred a proportionately much lower compensation expense.  Shareholders have been deprived of material information in connection with the annual meeting of shareholders in each year since 2007, and their votes at those meetings have not been fully informed as a result.

92.     At the May 19, 2011 shareholder meeting,  the Company announced that, with 62,560,436 shares of the Company outstanding, proxies for 51,300,000 shares had been returned, representing 82% of the outstanding shares, and thus, a quorum was present.  Indeed, the quorum present at the May 19, 2011 meeting far exceeded the quorum present at the previous year's shareholder meeting, which (with proxies returned for 45 million shares) represented 73% of the outstanding vote.  Nonetheless, Sophocles Zoullas announced that the shareholder meeting would be adjourned and reconvened on June 17, 2011 in order to allow more shareholders to vote.

93.     On May 19, 2011, the Company filed with the Securities Exchange Commission on Schedule 14A an announcement of the adjournment. No explanation was provided in that filing for adjourning a meeting when 82 percent of the shares had already attended the May 19 meeting.

94.     There is no need for further shareholder voting, in light of the large quorum at the meeting convened on May 19, 2011. Because a huge quorum existed, the shareholder votes for directors and the various proposals should have simply been counted and the results announced. However, in the interim between May 19 and June 17, 2011, the Company is endeavoring, through additional proxy solicitations, to obtain more shareholder votes when such votes are not necessary in light of the quorum. These unnecessary solicitation expenses will be borne by the Company. The Company will also bear the expenses of holding a second annual meeting when it is reconvened on June 17, 2011. All of those expenses are completely unnecessary.

95.     Moreover, because the election of directors and approval of the auditor was uncontested, there were sufficient votes at the May 19 meeting to elect the board's nominees and approve the auditor. The only explanation for the adjournment was that there were more votes against the proposal to approve compensation paid to executives than there were votes for it, and the defendants were seeking to solicit yet more proxies in an attempt to reverse what would

39

otherwise be shareholder disapproval of the compensation proposal.  The

defendants' decision to adjourn the meeting and incur unnecessary additional proxy

solicitation expenses, rather than simply count the vote of the 82% shareholder

quorum at the May 19 meeting could only have been motivated by the board's desire

to obtain a less than fully informed shareholder approval of the excessive executive

compensation, a purpose that serves the interests of the executive officers (and in

turn the board through the *quid pro quo* arrangement) rather than those of the

shareholders.  The meeting adjournment is thus further evidence that in awarding the

excessive compensation to the executive officers, the board was disloyal to the

Company and its shareholders.

J.    <u>Governing Law and the Company's Charter and Bylaws</u>.

96.    The Company is governed by the Marshall Islands Business

Corporation Act ("BCA").  Section 16 of the BCA adopts U.S. corporate law to the

extent it does not conflict with the provisions of the BCA:

**§16. Construction; adoption of United States corporation law.**

This Act shall be applied and construed to make the laws of the
Republic, with respect to the subject matter hereof, uniform with the
laws of the State of Delaware and other states of the United States of
America with substantially similar legislative provisions. Insofar as it
does not conflict with any other provision of this Act, the non-statutory
law of the State of Delaware and of those other states of the United
States of America with substantially similar legislative provisions is
hereby declared to be and is hereby adopted as the law of the Republic,
provided however, that this section shall not apply to resident domestic
corporations.

97.    The BCA sets forth in Section 61 the standard of care that is applicable

to directors and officers:

## §61. Standard of care to be observed by directors and officers.

Directors and officers shall discharge the duties of their respective
positions in good faith and with that degree of diligence, care and skill
which ordinarily prudent men would exercise under similar
circumstances in like positions. In discharging their duties, directors
and officers, when acting in good faith, may rely upon financial
statements of the corporation represented to them to be correct by the
president or the officer of the corporation having charge of its books or
accounts, or stated in a written report by an independent public or
certified public accountant or firm of such accountants fairly to reflect
the financial condition of such corporation.

98.    The BCA also sets forth in Section 60 the circumstances under which a

corporation is permitted to indemnify its directors and officers for liability as a result

of serving as directors or officers, as follows:

## §60. Indemnification of directors and officers.

(1) *Actions not by or in right of the corporation.* A corporation shall
have the power to indemnify any person who was or is a party or is
threatened to be made a party to any threatened, pending or completed
action, suit or proceeding whether civil, criminal, administrative or
investigative (other than an action by or in the right of the corporation)
by reason of the fact that he is or was a director or officer of the
corporation, or is or was serving at the request of the corporation as a
director or officer of another corporation, partnership, joint venture,
trust or other enterprise, against expenses (including attorneys' fees),
judgments, fines and amounts paid in settlement actually and
reasonably incurred by him in connection with such action, suit or
proceeding if he acted in good faith and in a manner he reasonably
believed to be in or not opposed to the best interests of the corporation,
and, with respect to any criminal action or proceeding, had no

reasonable cause to believe that his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of no contest, or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

(2) *Actions by or in right of the corporation.* A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending, or completed action or suit by or in the right of the corporation to procure judgment in its favor by reason of the fact that he is or was a director or officer of the corporation, or is or was serving at the request of the corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by him or in connection with the defense or settlement of such action or suit if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable for negligence or misconduct *in* the performance of his duty to the corporation unless and only to the extent that the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case such person is fairly and reasonably entitled to indemnity for such expenses which the court shall deem proper.

(3) *When director or officer successful.* To the extent that a director or officer of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (1) or (2) of this section, or in the defense of a claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

(4) *Payment of expenses in advance.* Expenses incurred in defending a civil or criminal action, suit or proceeding may be paid in advance of the final disposition of such action, suit or proceeding as authorized by

the board of directors in the specific case upon receipt of an undertaking by or on behalf of the director or officer to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the corporation as authorized in this section.

(5) *Indemnification pursuant to other rights.* The indemnification and advancement of expenses provided by, or granted pursuant to, the other subsections of this section shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.

(6) *Continuation of Indemnification.* The indemnification and advancement of expenses provided by, or granted pursuant to, this section shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

(7) *Insurance.* A corporation shall have the power to purchase and maintain insurance on behalf of any person who is or was a director or officer of the corporation or is or was serving at the request of the corporation as a director or officer against any liability asserted against him and incurred by him in such capacity whether or not the corporation would have the power to indemnify him against such liability under the provisions of this section.

99.    BCA Section 60 distinguishes between "Actions not by or in the right of the corporation" (BCA Section 60(1)) and "Actions by or in right of the corporation" (BCA Section 60(2)). The difference between these provisions is that as to actions brought in the right of the corporation, such as this one, the corporation is precluded from indemnifying for claims for which the director or officers "shall

have been adjudged to be liable for negligence or misconduct *in* the performance of his duty to the corporation."

100.    Consistent with BCA Section 60(2), the Company's Bylaws provide in Article VIII, Section 2, that as to suits brought by or in the right of the Company, "no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable for negligence or misconduct in the performance of such persons duty to the Corporation unless and only to the extent that the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the court shall deem proper."

## DERIVATIVE AND DEMAND ALLEGATIONS

101.    Plaintiffs bring this action derivatively, in the right and for the benefit of the Company, to redress the breaches of fiduciary duty by the Defendants. Plaintiffs will adequately and fairly represent the Company and its shareholders in enforcing and prosecuting its rights.

102.    Plaintiffs have not made a demand upon the board of the Company to take remedial action on behalf of the Company against the Defendants, because the board participated in, approved, and/or permitted the wrongs alleged herein and is not disinterested and lacks sufficient independence to exercise business judgment.

103.   None of individual Defendants are or may be indemnified by the Company for their wrongdoing, because neither the Company Bylaws nor the Marshall Islands BCA permits indemnification for a shareholder derivative claim of negligence or misconduct in the performance of a duty to the corporation.

104.   In 2008, the board consisted of Cianciolo, Hiley, Haensel, Tomasson, Wylie, Alexis Zoullas, Sophocles Zoullas; and the Compensation Committee consisted of Tomasson, Cianciolo and Wylie.  In 2009, the board consisted of Cianciolo, Hiley, Haensel, Tomasson, Wylie, Sophocles Zoullas, Alexis Zoullas; and the Compensation Committee consisted of Tomasson, Cianciolo, and Wylie.  In 2010, the board consisted of Cianciolo, Hiley, Haensel, Tomasson, Wylie (through May 2010), and Winmill (beginning May 2010), Sophocles Zoullas, Alexis Zoullas; and the Compensation Committee consisted of Tomasson, Cianciolo, and Winmill.

A.   Excessive Director Compensation.

105.   Director compensation was determined by the Company's board and/or Company's Compensation Committee, the members of which were self-interested in those decisions in 2008, 2009 and 2010.  Accordingly, demand on the board to initiate litigation for a claim for excessive director compensation in 2008, 2009 and 2010 would be futile.

B.   <u>Excessive Compensation of Officers and 2008 Employment Agreement</u>.

106.   Compensation of the Company's executive officers was determined by the Company's Compensation Committee, and approved by the board.

107.   The compensation of Sophocles Zoullas, Alexis Zoullas and Alan Ginsberg in 2008, 2009, and 2010 was so excessive that it constituted waste to the Company.  In addition, the 2008 Employment Agreement is so one-sided that it constitutes waste to the Company.  Because these transactions involve waste by the board, demand on the board to initiate litigation for these claims would be futile.

108.   Also, the board's decision to award the excessive compensation to the executive officers in 2008, 2009, and 2010, as well as the 2008 Employment Agreement, were part of a *quid pro quo* arrangement.  Pursuant to this *quid pro quo* exchange, the board awarded huge sums and other benefits to executive officers at the direction of Sophocles Zoullas, so that the executive officers would not object when the directors took excessive and escalating amounts from the Company for themselves.  Accordingly, the board was self-interested in making those executive compensation decisions, and thus, demand on the board to initiate the litigation on behalf of the Company would be futile.

109.   Furthermore, the board's executive compensation decisions in 2008, 2009, and 2010, which were not benchmarked to industry compensation and were

far in excess of the Company's competitors, were not made in good faith, loyalty, or with the degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances.  Also, the board's decision to enter into the 2008 Employment Agreement was not made in good faith, loyalty, or with the degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances.  The board made these decisions in the same period during which: (i) they suspended the Company's fundamental policy to pay dividends to shareholders, even though there was sufficient cash flow to pay those dividends, (ii) the Company underperformed its peers whose executive compensation was proportionately far lower; and (iii) the Company suffered a major fall in its stock price causing shareholders to lose substantially all of their investment.

110.   Accordingly, the board's compensation decisions constituted breaches of the standard of care applicable to the directors of the Company, for which the directors are liable and for which no indemnity is available.  The directors' potential personal liability for these claims of excessive compensation claims in the litigation raise doubt that they are disinterested or independent, and thus demand on the board to initiate the litigation on behalf of the Company would be futile.

C.   <u>Sophocles Zoullas' Participation in Delphin and the Management Agreement</u>.

111.   The board agreed to allow Sophocles Zoullas to participate in Delphin, an enterprise that directly competes with the Company.  The board also agreed to allow the Company to enter into the Management Agreement, through which Sophocles Zoullas could run Delphin and the Company together.

112.   The board allowed Sophocles Zoullas to run Delphin side by side with the Company, even though the 2008 Employment Agreement (which provides virtually no valuable rights to the Company), requires Zoullas to devote substantially all of his business time and attention to the business and affairs of the Company and its subsidiary Eagle Shipping International and furthermore imposes on him the "duties and responsibilities" as are commensurate with a Chief Executive Officer, including the duty of loyalty.

113.   The arrangement contained in the Management Agreement sets up an ongoing conflict, for which the Company is not protected; there is no way to set up this type of arrangement to preclude Sophocles Zoullas (who wears "two hats") from cherry-picking charters and other benefits to gain an advantage for his private company Delphin instead of Eagle Bulk Shipping.  The rights of first refusal cannot "cure" this conflict, because the management responsible for the day-to-day implementation of the Management Agreement is conflicted.

114.   The Conflicts Committee that is set up to oversee conflicts stemming from the Management Agreement is itself conflicted.  The committee members receive excessive compensation, which was $65,000 in 2010 for two meetings, which compensation depends on the existence of the Management Agreement.

115.   Also, the board's decision to allow Sophocles Zoullas to participate in Delphin and use Company resources in that pursuit, was part of a *quid pro quo* arrangement.  Pursuant to this *quid pro quo* exchange, the board permitted Sophocles Zoullas to enrich himself at the expense of the Company, so that the executive officers would not object when the directors took excessive and escalating amounts from the Company for themselves.  Accordingly, the board was self-interested in agreeing to the Management Agreement, and thus, demand on the board to initiate the litigation on behalf of the Company would be futile.

116.   In addition, the Management Agreement is so one-sided that it constitutes waste to the Company, and thus demand on the board to initiate litigation for this claim would be futile.

117.   Furthermore, the decision to bind the Company to the Management Agreement, which is unfair to the Company, was not made in good faith, loyalty, or with the degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances.  Accordingly, that decision constituted a breach of the standard of care applicable to the directors of the Company, for which

the directors are liable and for which no indemnity is available. The directors' potential personal liability for this claim raises doubt that they are disinterested or independent, and thus demand on the board to initiate the litigation on behalf of the Company would be futile.

D.    The Adjournment of the 2011 Annual Meeting.

118.   The board adjourned the annual meeting on May 19, 2011 purportedly to allow more time for shareholders to vote. They did this, even though the Company had proxies representing 82% of the vote, a 9% increase in voters from the prior year.

119.   The Company is engaging in additional costly proxy solicitation and will bear expenses of holding another meeting, even though there is no valid business reason for doing so. The only possible reason for soliciting more proxies is to attempt to reverse what would otherwise be shareholder disapproval of excessive compensation paid to the executive officers, which serves the interests of those officers and the directors (through a *quid pro quo*) rather than the Company and its shareholders.

120.   The board's decision to adjourn the shareholder meeting and incur costs to solicit additional proxies and hold another annual meeting is waste to the Company, and thus demand on the board to initiate litigation for this claim would be futile.

121.   Furthermore, the decision to adjourn the shareholder meeting and incur costs to solicit additional proxies and hold another annual meeting was not made in good faith, loyalty or with the degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances.  Accordingly, that decision constituted a breach of the standard of care applicable to the directors of the Company, for which the directors are liable and for which no indemnity is available. The directors' potential personal liability for this claim raises doubt that they are disinterested or independent, and thus demand on the board to initiate the litigation on behalf of the Company would be futile.

## FIRST CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY– DIRECTOR COMPENSATION

122.   Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

123.   The Defendants were awarded compensation for acting as directors in 2008, 2009, and 2010 that far exceeded any amount that a reasonable director in similar circumstances would approve or accept.  In addition, the grant of director compensation violated the bylaws of the Company and the Marshall Islands BCA, in that it was determined by the Compensation Committee and it included salary, per meeting stipends, and stock options.

124.   The Defendants owed and owe the Company fiduciary obligations. They have violated the duty of loyalty and have not discharged their duties in good

faith and with the degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions in setting their own compensation.

125.   The excessive compensation paid to the Defendants as directors' fees in 2008, 2009, and 2010 also constituted waste.  The Defendants were self-interested in those compensation decisions and the decisions were unfair to the Company.

126.   The Company and its shareholders have suffered and will continue to suffer harm as a result of Defendants' wasteful conduct and breaches of fiduciary duties.

## SECOND CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY - OFFICER COMPENSATION

127.   Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

128.   The Defendants approved compensation to the executive officers in 2008, 2009, 2010 that was excessive and agreed to a one-sided 2008 Employment Agreement that favored Sophocles Zoullas and provided little or no benefit to the Company.

129.   Because there was a *quid pro quo* with the executive officers, whereby the directors would award excessive compensation to the executive officers (following the recommendations of Sophocles Zoullas) to ensure that those officers would take no action while the directors appropriated large sums of corporate assets

for themselves, each of the Defendants was interested in the executive compensation decisions. Moreover, no reasonable director would or could award the type of outsized compensation that the board awarded to the executive officers of the Company.

130. The Defendants owed and owe the Company fiduciary obligations. They have violated the duty of loyalty and have not discharged their duties in good faith and with the degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions in setting executive compensation and approving the 2008 Employment Agreement.

131. The executive compensation paid to officers in 2008, 2009, and 2010, as well as the 2008 Employment Agreement constituted waste.

132. The Company and its shareholders have suffered and will continue to suffer harm as a result of Defendants' wasteful conduct and breaches of fiduciary duties. The Company is entitled to recover all amounts of excessive compensation paid to the executive officers from the officers themselves or from the Defendants who are directors.

133. The 2008 Employment Agreement should be rescinded because it was the result of the Defendants' breaches of fiduciary duty and constitutes waste.

## THIRD CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY - DELPHIN

134.   Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

135.   The Defendants have permitted Defendant Sophocles Zoullas to participate in Delphin and approved the Management Agreement that is unfair to the Company and structured to allow a competitor to have access and make decisions for the Company, a conflict that cannot be cured.

136.   The Defendants owed and owe the Company fiduciary obligations. They have violated the duty of loyalty and have not discharged their duties in good faith and with the degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions in approving the Management Agreement and allowing Sophocles Delphin to participate in Delphin.

137.   Moreover, Defendant Sophocles Zoullas had breached both his fiduciary duties and the 2008 Employment Agreement by devoting his efforts to an enterprise that competes directly with the Company.  Even if that agreement permitted him somehow to directly compete with the Company, he has breached his fiduciary duty of loyalty by establishing a continuing conflict of interest with the Company and committing substantial Company resources to his own enterprise without securing nearly adequate compensation for the Company for the use of its resources or the loss of business opportunities.

138.   No reasonable director would allow Delphin to compete with the Company or agree to provide management resources to Delphin at any rate, let alone the paltry rate that the Defendants have agreed to, and the Defendants' actions constituted waste.

139.   The Company and its shareholders have suffered and will continue to suffer harm as a result of Defendants' wasteful conduct and breaches of fiduciary duties.

## FOURTH CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY—MEETING ADJOURNMENT

140.   Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

141.   In the face of a quorum consisting of 82% of the outstanding shares, a quorum that is unprecedented in size, the Defendants adjourned the May 19 meeting to June 17 in order to solicit yet more proxies.  The expense associated with the additional solicitation and meeting is entirely unnecessary, in light of the fact that the votes of the 82% quorum could simply have been tallied and the meeting completed on May 19.  The only possible reason for soliciting more proxies is to attempt to reverse what would otherwise be shareholder disapproval of excessive compensation paid to the executive officers, which serves the interests of those officers and the directors (through a *quid pro quo*) rather than the Company and its shareholders.

142.   The Defendants owed and owe the Company fiduciary obligations. They have violated the duty of loyalty and have not discharged their duties in good faith and with the degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions in adjourning the 2011 shareholder meeting.

143.   The Defendants are liable for waste for adjourning the 2011 shareholder meeting when the Company had already collected proxies representing 82% of the shares, which was more than sufficient to satisfy a quorum.

144.   The Company and its shareholders have suffered and will continue to suffer harm as a result of Defendants' wasteful conduct and breaches of fiduciary duties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and derivatively on behalf of Eagle Bulk Shipping, demand judgment as follows:

(a)   Determining that the suit is a proper derivative action and certifying the Plaintiffs as the appropriate representatives of the Company for said action;

(b)   Declaring that each of the individual Defendants has breached his fiduciary duties and committed waste in making the excessive director compensation decisions in 2008, 2009 and 2010;

(c)      Declaring that each of the individual Defendants has breached his fiduciary duties and committed waste in awarding or receiving excessive executive compensation in 2008, 2009 and 2010 and in agreeing to the 2008 Employment Agreement;

(d)      Declaring that each of the individual Defendants has breached his fiduciary duties and committed waste in allowing Sophocles Zoullas to be involved with Delphin and for binding the Company to the Management Agreement;

(e)      Declaring that each of the individual Defendants has breached his fiduciary duties and committed waste in adjourning the 2011 annual shareholder meeting;

(f)      Rescinding the compensation payments in 2008, 2009 and 2010 to each of the directors and officers and rescinding the 2008 Employment Agreement and Management Agreements;

(g)      Rescinding the Management Agreement and enjoining Defendant Sophocles Zoullas from engaging in any activity in competition with the Company;

(h)      Enjoining the Defendants from further actions of waste and breach of fiduciary duty;

(i)      Directing each of the Defendants to account to the Company for all damages sustained by the Company as a result of the breaches of fiduciary duties and waste of corporate assets;

(j)     Awarding damages, together with pre- and post-judgment interest, to the Company;

(k)     Awarding the Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

(l)     Granting such other and further relief as the Court deems just and proper.

Dated:  October 12, 2011

Respectfully submitted,

CHITWOOD HARLEY HARNES LLP

By:  _Cal Slul_____

Carol S. Shahmoon, CS-8607
cshahmoon@chitwoodlaw.com
Gregory E. Keller, GK-4562
gkeller@chitwoodlaw.com
1350 Broadway, Suite 908
New York, NY 10018
Tel:  (917) 595-4600

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x
                :

John T. Metcalf,             :     ECF CASE

             Plaintiff,   :

                :     11-cv-03996-AKH

       v.            :

Sophocles N. Zoullas, et al.,   :

           Defendants. :

-------------------------------------------------- x

## DECLARATION OF LAWRENCE DOPPELT

Pursuant to 28 U.S.C. § 1746, Lawrence Doppelt declares as follows:

I am a Co-Trustee of the Frederick Doppelt Trust (the "Trust") and possess the customary powers to hold, manage, protect and dispose of Trust assets. The Trust is and has been continuously since July 11, 2005 a shareholder of Eagle Bulk Shipping Inc.

I have read the Amended Complaint in the above-entitled action and know the contents thereof, and the same is true to my own knowledge, except as to the matters stated therein to be alleged upon information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Lawrence Doppelt

Executed on: ___10 | 3 | 11___
             (date)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------- x

John T. Metcalf,                                    :
                                                    :
                              Plaintiff,            :     ECF CASE
                                                    :
                    v.                              :     11-cv-03996-AKH
                                                    :
Sophocles N. Zoullas, et al.,                       :
                                                    :
                              Defendants.           :
                                                    :
----------------------------------------------------- x

## DECLARATION OF MANNY DOPPELT

Pursuant to 28 U.S.C. § 1746, Manny Doppelt declares as follows:

I am a Co-Trustee of the Frederick Doppelt Trust (the "Trust") and possess the customary powers to hold, manage, protect and dispose of Trust assets. The Trust is and has been continuously since July 11, 2005 a shareholder of Eagle Bulk Shipping Inc.

I have read the Amended Complaint in the above-entitled action and know the contents thereof, and the same is true to my own knowledge, except as to the matters stated therein to be alleged upon information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Manny Doppelt

Executed on: _____9 / 26 / 11_____
                    (date)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x

John T. Metcalf,

              Plaintiff,

        v.

Sophocles N. Zoullas, et al.,

            Defendants.

-----------------------------------------------------x

ECF CASE

11-cv-03996-AKH

## DECLARATION OF JOHN T. METCALF

Pursuant to 28 U.S.C. § 1746, John T. Metcalf declares as follows:

I am a Plaintiff in the above-entitled action. I am and have been continuously since December 31, 2008 a shareholder of Eagle Bulk Shipping Inc.

I have read the Modified Complaint in the above-entitled action and know the contents thereof, and the same is true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

_John T. Metcalf_
John T. Metcalf

Executed on: _October 8, 2011_
                    (date)

ECEIVED
OCT 12 2011
U.S.D.C. S.D.N.Y.
CASHIERS