UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x

JOHN T. METCALF et al.,

                            Plaintiffs,

    -against-

SOPHOCLES N. ZOULLAS et al.,

                            Defendants.

------------------------------------------------------------ x

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:**
**DATE FILED: 1/19/12**

**OPINION AND ORDER
DENYING DEFENDANTS'
MOTION TO DISMISS**

11 Civ. 3996 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

       This derivative shareholder action is brought by Plaintiffs to assert claims on behalf of Eagle Bulk Shipping Inc. ("Eagle"), a Republic of the Marshall Islands corporation engaged primarily in the ocean transport of bulk cargoes. The essence of Plaintiffs' allegations is that since 2007 Eagle has been operated by its Directors and executive officers primarily to benefit its Directors and executive officers, and not for the benefit of the corporation and its shareholders. On September 7, 2011, Defendants moved to dismiss Plaintiffs' Complaint. At the conclusion of oral argument, and by my Summary Order of November 22, 2011, I denied Defendants' motion. This opinion provides a fuller explanation of my decision.

**I.    Plaintiffs' Complaint**

       Plaintiffs bring suit against current members of Eagle's Board of Directors, one former Director, and certain Eagle executive officers: Sophocles Zoullas (Chief Executive Officer and Director), Alexis Zoullas (Director), Alan Ginsburg (Chief Financial Officer), Douglas Haensel (Director), Jon Tomasson (Director), Joseph Cianciolo (Director), David Hiley (Director), Thomas Winmill (Director), and Forrest Wylie (former Director) (together,

"Defendants"). Compl. ¶¶ 4-12. Plaintiff's allegations focus on decisions by Eagle's Board regarding: (1) director compensation; (2) executive officer compensation; and (3) Delphin Shipping LLC ("Delphin"), an alleged competitor.[1]

Plaintiffs allege that following a 2007 change in Eagle's ownership, Eagle's Board restructured the manner in which the Directors were compensated. Compl. ¶¶ 28-31. In addition to receiving a fixed salary as well as options and dividend equivalent payments as was the previous practice, Directors began to receive compensation for each Board or committee meeting attended, resulting in significantly increased and excessive compensation. Compl. ¶¶ 31-32. Plaintiffs allege that the restructured compensation scheme violated Eagle's Bylaws, which provide that Directors can be compensated on the basis of meetings attended or by a fixed salary. Compl. ¶ 32. Plaintiffs further allege that in 2008, 2009 and 2010, Eagle's director compensation decisions were made by a committee of Eagle's Board, rather than the Board itself, in violation of Section 57 of the Marshall Islands Business Corporations Act. Compl. ¶ 33.

Plaintiffs allege that in 2008, 2009 and 2010, Eagle's director compensation "reached levels that were generally three to four times the compensation paid in 2006 and in some cases were up to ten times as much," despite no change in director responsibilities and duties. Compl. ¶¶ 29-37. For example, Plaintiffs allege that the Board met 20 times in 2010 as compared with six times in 2006, and that after meeting one time in 2006, the Compensation Committee met 30 times in 2008, 40 times in 2009 and 24 times in 2010. Compl. ¶ 37-41. Plaintiffs allege that in 2007, no non-employee director received compensation in excess of $117,000 and that in 2009 and 2010 certain non-employee directors received compensation in

---

[1] Plaintiffs' Complaint also includes a claim with respect to the adjournment of Eagle's annual meeting from May 19, 2011 to June 17, 2011, but this claim has been dismissed on consent with prejudice.

2

excess of $475,000. Compl. ¶¶ 30-36, 54. Plaintiffs further allege that Eagle's spending on director compensation during this period was far in excess of its alleged competitors. Compl. ¶¶ 41, 53-54, 58-59. For example, Plaintiffs allege that Eagle's 2010 director compensation was nearly four times that of Genco Shipping & Trading Limited ("Genco"), an alleged competitor also incorporated in the Marshall Islands that is alleged to be nearly five times as profitable and have 25% more vessels in operation than Eagle. Compl. ¶¶ 41, 53-54.

Plaintiffs allege that "[h]and in hand with the extraordinary rise in director compensation came skyrocketing executive compensation awards, bearing no relationship to Company performance, which was at its worst during this same period." Compl. ¶ 38. Plaintiffs allege that Eagle did not benchmark its executive officer compensation to comparable companies (and misstated its reasons for failing to do so), nor did it "use[] key financial measurements to inform compensation decision." Compl. ¶¶ 41, 52, 60. Plaintiffs allege, for example, that Sophocles Zoullas received $35,788,323 in compensation in 2008, $8,582,112 in 2009, and $8,347,867 in 2010. Compl. ¶¶ 42-44. In addition to this compensation, Plaintiffs allege that Sophocles Zoullas' 2008 employment contract was unreasonable (and in stark contrast to his 2005 employment agreement) in granting Zoullas the unilateral right to quit at will without penalty while imposing punitive costs on Eagle should Zoullas be terminated. Compl. ¶¶ 61-67.

Plaintiffs allege that for 2008-2010, Eagle's total executive officer compensation was approximately $65.8 million and Eagle's total director compensation was approximately $6.4 million, together more than half of Eagle's combined net income of approximately $121.8 million. Compl. ¶ 51. Plaintiffs allege that in 2010 Eagle paid cash compensation to its directors and executive officers equivalent to 45.5% of its net income, while competitors paid between 6.2% and 1.4%. Compl. ¶ 59. Plaintiffs further allege that Eagle's director and executive officer

3

compensation during this period was sharply out of line with its performance and its stock's performance. Compl. ¶¶ 53-60, 68-76. Plaintiffs allege a decline in stock price of 90%, multiple defaults to Eagle's primary lender and an uncertain future as a going concern. Compl. ¶¶ 68-76.

Plaintiffs also allege that the relationship Eagle has negotiated between itself and Delphin is contrary to Eagle's interests. Plaintiffs allege that Eagle's Directors have permitted Sophocles Zoullas to form, and serve as non-executive chairman of, Delphin and that Eagle has entered into an agreement (the "Management Agreement") with Delphin that requires Eagle to provide all commercial and technical supervisory management services for Delphin's ships but does not provide Eagle with reasonable compensation in return. Compl. ¶¶ 77-85.

Plaintiffs allege the existence of a quid pro quo arrangement that causally links the Eagle Board's decisions regarding its own compensation with its decisions regarding executive officer compensation and Delphin. Plaintiffs allege that "[b]eginning in 2008, management and directors had a quid pro quo arrangement, in which the directors paid management excessive sums at the direction of Sophocles Zoullas, and the directors similarly awarded themselves dramatic pay increases, both by charging excessive rates and by holding an excessive number of meetings. Through this quid pro quo arrangement, the officers did not object to the dramatically increasing directors fees, because in return they were paid excessive compensation, and vice versa." Compl. ¶ 39. Plaintiffs further allege that "the board's decision to allow Sophocles Zoullas to participate in Delphin and use Company resources in that pursuit was part of a quid pro quo arrangement. Pursuant to this quid pro quo exchange, the board permitted Sophocles Zoullas to enrich himself at the expense of the Company, so that the executive officers would not object when the directors took excessive and escalating amounts from the Company for themselves." Compl. ¶ 115.

Plaintiffs bring claims for breach of fiduciary duty with respect to director compensation, executive officer compensation, and the Management Agreement and the Board's permitting Sophocles Zoullas to participate in Delphin. Compl. ¶¶ 122-144. Plaintiffs bring their action derivatively, without demand upon the Eagle Board since, as Plaintiffs allege, "the board participated in, approved, and/or permitted the wrongs alleged . . . and is not disinterested and lacks sufficient independence to exercise business judgment." Compl. ¶ 102.

## II. Defendants' Motion to Dismiss

Defendants have moved to dismiss Plaintiffs' Complaint. Defendants argue that Plaintiffs' claims regarding executive compensation and Delphin are precluded pursuant to Fed. R. Civ. P. 23.1 by Plaintiffs' failure to plead demand futility with particularity. Furthermore, Defendants argue that Plaintiffs' claims regarding director compensation must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

## III. Analysis

### A. Demand Futility

A derivative action "place[s] in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers. To prevent abuse of this remedy, however, equity courts established as a precondition for the suit that the shareholder demonstrate that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions." Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 95-96 (1991) (citations and quotation marks omitted). Pursuant to Fed. R. Civ. P. 23.1, a derivative claim should be dismissed if it fails to "state with particularity . . . any effort by the plaintiff to obtain the desired action from the directors . . . and . . . the reasons for not obtaining the action or not making the effort." "Because Rule 23.1 requires

5

particularized allegations, the pleading standard is higher than the standard applicable to a pleading subject to a motion to dismiss pursuant to Rule 12(b)(6). When considering a motion to dismiss for failure to satisfy Rule 23.1's particularity requirement, the Court accepts as true all well-pleaded allegations and all reasonable inferences drawn therefrom." In re Forest Labs., Inc. Derivative Litig., 450 F. Supp. 2d 379, 387 (S.D.N.Y. 2006) (citations omitted). However, "[a] plaintiff may not simply rely on conclusory allegations." Halpert Enterprises, Inc. v. Harrison, 362 F. Supp. 2d 246, 429-30 (S.D.N.Y. 2005).

While Fed. R. Civ. P. 23.1 is "a rule of pleading that creates a federal standard," RCM Securities Fund, Inc. v. Stanton, 928 F.2d 1318, 1330 (2d Cir. 1991), the underlying substantive requirements are determined by the law of the jurisdiction of incorporation. Kamen, 500 U.S. at 98-99. Marshall Islands law requires a shareholder asserting a claim derivatively on behalf of a corporation to allege with particularity the reasons why demand would have been futile. 52 Marshall Islands Revised Code 1, § 79(3) (2007); Rosenquist v. Economou, No. 2010-002, at *10 (Sup. Ct. Marshall Islands Oct. 5, 2011). "Marshall Islands law . . . look[s] to Delaware corporate law. Pursuant to Delaware law, where a plaintiff fails to make a demand on the board of directors to initiate litigation, courts apply the two-part test for demand futility set forth in Aronson v. Lewis, 473 A.2d 805 (Del. 1984)." Rosenquist, No. 2010-002 at *10 (citation omitted).

Under Aronson, the court "must decide whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." Aronson, 473 A.2d at 814.[2] Directors are disinterested when they "neither appear on

---

[2] While not argued by Plaintiffs or Defendants, demand futility with respect to Plaintiffs' claim that Defendants breached their fiduciary duties in "allowing Sophocles Zoullas to participate in Delphin" might properly be analyzed

both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." Id. at 812. "[I]f either prong is satisfied, demand is excused." Brehm v. Eisner, 746 A.2d 244, 256 (Del. 2000). The question here is whether the quid pro quo alleged by Plaintiffs satisfies Aronson.

Delaware courts have found certain factual allegations sufficient to infer a causal link between directors' enrichment and their indifference to corporate waste, raising reasonable doubt as to the disinterestedness of the directors' decisions and making the required demand futile. In In re National Auto Credit, Inc. S'holders Litig., 2003 WL 139768 (Del. Ch. Jan. 10, 2003), for example, plaintiffs' derivative complaint alleged that three resolutions approved at a single board meeting, two allegedly intended to consolidate the CEO's control and one increasing director compensation, together constituted a quid pro quo arrangement. The Court of Chancery denied a motion to dismiss the complaint for failure to make demand, finding that because it was a "reasonable inference from the particularized facts of the Complaint that the Resolutions are to be viewed as a single, interrelated set of transactions, authorized as a quid pro quo," "the Plaintiffs ha[d] alleged particularized facts that create[d] a reasonable doubt regarding the disinterestedness" of the directors such that demand was futile and excused. In re National Auto Credit, 2003 WL 139768 at *8-9; see also In re Tyson Foods, Inc. Consol. S'holder Litig., 919 A.2d 563, 583 (Del. Ch. 2007).

---

under Rales v. Blasband, 634 A.2d 927 (Del. 1993), rather than Aronson as Plaintiffs appear to complain of board inaction rather than of a transaction undertaken. See, e.g., In re Goldman Sachs Group, Inc. S'holder Litig., 2011 WL 4826104 (Del. Ch. Oct. 12, 2011). However, Plaintiffs have alleged that Defendants permitted Sophocles Zoullas to participate in Delphin as part of a quid pro quo arrangement and that under Rales "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that . . . the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand," 634 A.2d at 934, the analysis of pleading sufficiency is the same.

7

Inferring a causal link between director self-compensation decisions and other director decisions requires viewing the director self-compensation decisions and the other director decisions as an interrelated set of transactions. In the demand futility context, "[i]n deciding whether to consider a sequence of transactions separately or collectively, the Court reviews the circumstances surrounding the challenged transactions, as alleged by the particularized facts of the complaint, to decide whether it can be reasonably inferred that those transactions constituted a single, self-interested scheme." In re National Auto Credit, 2003 WL 139768 at *9. The timing of the transactions is a significant factor in this determination, but is not the sole factor. See id.[3] In In re Tyson Foods, the Court of Chancery permitted the inference of a quid pro quo arrangement where plaintiffs presented "a conspiracy-style theory of related-party transactions" stretching over more than half a decade. 919 A.2d at 583. Furthermore, the Court of Chancery has recognized the error in placing form over substance in deciding whether to consider a sequence of transactions separately or collectively. See In re National Auto Credit, 2003 WL 139768 at *10. If an inference of a quid pro quo arrangement could never arise from non-contemporaneous transactions, those engaged in such misdeeds could too easily render their malfeasance immune from the disinfecting sunlight of shareholder derivative actions, simply by spreading the transactions across multiple board meetings.

Here it is a reasonable inference from the particularized facts of Plaintiffs' Complaint that the Directors' self-compensation decisions and the Directors' decisions regarding executive officer compensation and Delphin should be considered together for purposes of

---

[3] Defendants note a decision of the High Court of the Marshall Islands that in dicta suggests that an inference of a quid pro quo arrangement requires the underlying decisions be contemporaneous. See Rosenquist v. Economou, No. 2009-056, at *20 n.14 (High Ct. Marshall Islands Feb. 19, 2010). However, the High Court made plain that it was not considering the quid pro quo allegations. Id. Furthermore, the High Court based this dicta upon In re National Auto Credit, which sets forth no such requirement of contemporaneousness. The Supreme Court of the Marshall Islands did not address the quid pro quo allegations upon appeal. Rosenquist, No. 2010-002.

8

determining demand futility. Taken as a whole, the particularized facts of Plaintiffs' Complaint do not require but nonetheless permit the inference that the decisions of Eagle's Board at issue were part of a scheme, enabled either by the exchange of mutual indifference or a more explicit agreement, between the Directors and executive officers, pursuant to which each took what it could from Eagle. This theory makes sense of the series of action and inactions by Defendants alleged by Plaintiffs, including striking increases in compensation that bore no relation to performance or industry norms, were enacted in violation of Eagle's Bylaws and Marshall Islands law, and have endangered Eagle's continuing viability. Considering the Directors' decisions together and given the particularized factual allegations in Plaintiffs' Complaint, the quid pro quo arrangement alleged by Plaintiffs is a reasonable inference and creates a reasonable doubt as to the disinterestedness of a majority of the Directors with respect to their decisions regarding executive compensation and Delphin. Thus, pursuant to Aronson's first prong, demand is futile and excused.

      Defendants contend that Plaintiffs must prove quid pro quo independently and not as an inference from instances of challenged business transactions. Defendants argue that the two prongs of Aronson are meant to be independent inquiries, for if inference could prove the fact, the demand requirement would not serve as a "bulwark to protect the managerial discretion of directors." In re InfoUSA, Inc. S'holders Litig., 953 A.2d 963, 989 (Del. Ch. 2007). But similar facts can give rise to different, but complimentary, inferences. Here, Plaintiffs have "'provide[d] the Court with reason to suspect that each director [acted] . . . out of self-interest'" with particularized factual allegations supporting an inference of a quid pro quo arrangement. Rosenquist, No. 2010-002 at *19 (quoting In re InfoUSA, 953 A.2d at 989). Pleading formalities

9

are intended to be a threshold that permits close examination, not an inexorable impediment to shelter fraud and gross misconduct.

### B. Failure to State a Claim

Defendants argue that Plaintiffs fail to state a claim for breach of fiduciary duty regarding the establishment of allegedly excessive director compensation. To survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a claim must be "plausible on its face" when the court accepts as true all of the complaint's factual allegations. Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

Plaintiffs argue that the sufficiency of their claim should be determined under Delaware law, while Defendants argue that Delaware's director compensation statute conflicts with Marshall Islands law and thus New York law should be applied. See Def. Mem. Support Mot. Dismiss at 9-10. The Court need not resolve this dispute for Plaintiffs' claim suffices regardless.

With respect to director compensation, the New York Court of Appeals has held:

> The courts will not undertake to review the fairness of official salaries, at the suit of a shareholder attacking them as excessive, unless wrongdoing and oppression or possible abuse of a fiduciary position are shown. However, the courts will take a hand in the matter at the instance of the corporation or of shareholders in extreme cases. A case of fraud is presented where directors increase their collective salaries so as to use up nearly the entire earnings of a company; where directors or officers appropriate the income so as to deprive shareholders of reasonable dividends, or perhaps so reduce the assets as to threaten the corporation with insolvency. Thus, a complaint challenging the excessiveness of director compensation must—to survive a dismissal motion—allege compensation rates excessive on their face or other facts which call into question whether the compensation was fair to the corporation when approved, the good faith of the directors setting those rates, or that the decision to set the compensation could not have been a product of valid business judgment.

Marx v. Akers, 88 N.Y.2d 189, 203-204 (N.Y. 1996) (citation and quotation marks omitted).

10

Under this standard, Plaintiffs' particularized factual allegations regarding director compensation suffice to survive Defendants' motion to dismiss for failure to state a claim. Defendants have alleged compensation rates excessive on their face and other facts which call into question whether the compensation was fair to the corporation when approved, the good faith of the directors setting those rates, or that the decision to set the compensation could not have been a product of valid business judgment. Similarly, Plaintiffs' particularized factual allegations regarding director compensation suffice to survive Defendants' motion to dismiss for failure to state a claim under Delaware law. "Like any other interested transaction, directoral self-compensation decisions lie outside the business judgment rule's presumptive protection, so that, where properly challenged, the receipt of self-determined benefits is subject to an affirmative showing that the compensation arrangements are fair to the corporation." Telxon Corp. v. Meyerson, 802 A.2d 257, 265 (Del. 2002). "Notwithstanding the effects of any procedural safeguards utilized in approving the transaction, the initial burden of proving the entire fairness of the transaction is borne by the defendants. Thus, a plaintiff can survive a motion to dismiss under Rule 12(b)(6) by pleading facts from which a reasonable inference can be drawn that a majority of the board was interested or lacked independence with respect to the relevant decision." New Jersey Carpenters Pension Fund v. Infogroup, Inc., 2011 WL 4825888, at *8 (Del. Ch. Sept. 30, 2011) (footnote omitted); see also Steiner v. Meyerson, 1995 WL 441999, at *7 (Del. Ch. July 19, 1995) ("I cannot, under the more demanding fairness analysis applicable to fiduciary duty claims, now conclude that there is no state of facts consistent with the allegations that would entitle plaintiff to relief on this claim. Thus, this fiduciary duty claim properly states a claim upon which relief might be given.").

## IV. Conclusion

For the reasons stated above, and as provided by my Summary Order of November 22, 2011, Defendants' motion to dismiss is denied.

SO ORDERED.

Dated: January 19, 2012
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

12