UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| John T. Metcalf, et al.<br><br>                    Plaintiffs,<br><br>            v.<br><br>Sophocles N. Zoullas, et al.,<br><br>                    Defendants. | ECF Case<br><br>11 Civ. 3996 (AKH) (HBP) |

**OUTSIDE DIRECTORS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Defendants Douglas P. Haensel, Jon Tomasson, Joseph M. Cianciolo, David B. Hiley, Thomas B. Winmill, and Forrest E. Wylie, submit the following statement of undisputed material facts.

## I.   FACTS CONCERNING EAGLE BULK'S BUSINESS

1. Eagle Bulk Shipping, Inc. ("Eagle") is a holding company engaged primarily in the ocean transportation of bulk cargoes, including iron ore, coal, grain, cement, and fertilizer. Modified Shareholder Derivative Complaint, dated October 12, 2011 ("Compl.") ¶¶ 16-17 (Dkt. No. 25); Answer to Compl., dated January 13, 2012 ("Answer") ¶¶ 16-17 (Dkt. 35).

2. Eagle is incorporated under the laws of the Republic of the Marshall Islands and headquartered in New York City, NY.  Compl. ¶ 17; Answer ¶ 17.

3. Eagle was formed in 2005 through a venture between private equity firm Kelso & Company ("Kelso") and Sophocles Zoullas, Eagle's Chief Executive Officer.  *See* Deposition Transcript of Sophocles Zoullas ("S. Zoullas Dep.") at 154 (attached as Ex. B to the Declaration of Michael G. Bongiorno ("Bongiorno Decl.").

4. Eagle made its initial public offering ("IPO") in 2005.  Compl. ¶ 15; Answer ¶ 15.

5. Following Eagle's IPO, Kelso owned the majority of Eagle's stock through a holding company named Eagle Ventures, LLC ("Eagle Ventures").  S. Zoullas Dep. 14:25-26; 15:1-20.

6. Sophocles Zoullas had a profit-sharing interest in Eagle Ventures.  S. Zoullas Dep. 15:21-25; 16:2-15.

7. In early 2007, Kelso sold its entire stake in Eagle and the two directors affiliated with Kelso resigned from the Eagle Board.  Compl. ¶ 25; Answer ¶ 25.

8. New directors were elected.  Compl. ¶ 25; Answer ¶ 25.

9. In 2005, Eagle owned four shipping vessels.  S. Zoullas Dep. 11:18-20.

- 1 -

10. In 2007, Eagle began to grow the size of its fleet of shipping vessels. *See* Deposition Transcript of Alexis Zoullas ("A. Zoullas Dep.") at 34:10-14 (Bongiorno Decl. Ex. C).

11. By the end of 2010, Eagle owned 43 shipping vessels. A. Zoullas Dep. 28:12-17; 34:7-9.

12. Eagle hired new employees to manage its expanding fleet. *See* Deposition Transcript of Joseph Cianciolo ("Cianciolo Dep.") at 58:17-21 (Bongiorno Decl. Ex. D).

13. Charter rates, which are the rates paid for the use of Eagle's ships, are Eagle's primary source of revenue. *See* Deposition Transcript of Douglas P. Haensel ("Haensel Dep.") at 49-50 (Bongiorno Decl. Ex. E).

14. Between May 2008 and December 2008, dry bulk shipping charter rates dropped by approximately 90%. *See* Deposition Transcript of Alan Ginsberg ("Ginsberg Dep.") at 18-19 (Bongiorno Decl. Ex. F).

15. The Baltic Dry Index provides a general assessment of the price of moving major raw materials by sea.

16. On May 30, 2008, the Baltic Dry Index closed trading at 11,440 points. Baltic Dry Index Historical Rate Chart, http://www.bloomberg.com/quote/BDIY:IND/chart (last visited April 1, 2013).

17. On December 2, 2008, the Baltic Dry Index closed trading at 684 points. *Id.*

18. In 2010, the relationship partner for Eagle's independent auditor completed his five year rotation and Eagle elected to solicit proposals from other auditing firms. Cianciolo Dep. 202-203; June 29, 2009 email from J. Cianciolo RE: "Audit appointment" at EB000000130

(Bongiorno Decl. Ex. G); July 22, 2010 email from D. Haensel RE: "Peer Group's auditors" at EB000005439-EB000005444 (Bongiorno Decl. Ex. H).

## II.     FACTS CONCERNING EXECUTIVE COMPENSATION

19.     Until Kelso sold its interest in Eagle in 2007, the majority of Sophocles Zoullas's compensation came via his profit-sharing interest in Eagle Ventures.  S. Zoullas Dep. 15-17.

20.     Sophocles Zoullas's profit-sharing interesting in Eagle Ventures ended when Kelso sold its interest in Eagle.

21.     Because Sophocles Zoullas no longer received compensation from his interest in Eagle Ventures, Eagle's Board reassessed Mr. Zoullas's compensation package.

22.     In October 2007, the Board hired Steven Hall & Partners ("Steven Hall"), a national compensation consultant that had no prior relationship with Eagle.  Ginsberg Dep. 55:16-19; 56:4-6.

23.     Steven Hall is in the business of advising companies in the areas of executive and director compensation.  *See* Deposition Transcript of Steven Hall ("Hall Dep.") at 6:18-21 (Bongiorno Decl. Ex. A).

24.     Mr. Steven Hall, the principal owner of Steven Hall, has over 30 years of experience in the field of compensation consulting.  Hall Dep. 6:22-24.

25.     Eagle retained Steven Hall for the purpose of reviewing Eagle's proposed Executive and Director compensation packages.  S. Zoullas Dep. 133:20-23.

26.     Eagle maintained a Compensation Committee consisting of outside Directors Jon Tomasson, Joseph Cianciolo, and David Hiley.  *See* January 14, 2008 Minutes of the Compensation Committee of Eagle Bulk Inc. at EB0000011581 (Bongiorno Decl. Ex. I).

27. After October 2007, Eagle's Board of Directors and Compensation Committee consulted with Steven Hall prior to approving any Executive or Director compensation decisions. *See* January 15, 2008 Minutes of the Compensation Committee of Eagle Bulk Inc. at EB0000011585 (Bongiorno Decl. Ex. J).

28. In 2008, Sophocles Zoullas, on behalf of Eagle, negotiated an amended syndicated loan facility with the Royal Bank of Scotland that gave Eagle an incremental additional financing commitment of $200,000,000. S. Zoullas Dep. 168:6-25; 169:2-4.

29. During his tenure, Sophocles Zoullas helped to create and develop an in-house technical management group that improved cost management and employee utilization. Hall. Dep. 228:2-11.

30. Eagle has not defaulted on any of its bank loans.

31. Eagle did not experience any charter defaults from 2008 through 2011. S. Zoullas Dep. 167:9-24; A. Zoullas Dep. 23:17-22.

32. In May 2008, Eagle appointed Alexis Zoullas as Vice President of Eagle to assist Sophocles Zoullas with Eagle's management duties. Cianciolo Dep. 70.

33. Alexis Zoullas was hired to assist Sophocles Zoullas with his management duties, as the Eagle Board determined that Sophocles Zoullas was "overworked." Cianciolo Dep. 70:13-19.

34. Eagle's Executives continued to manage Eagle's day to day activities.

35. The Compensation Committee of Eagle's Board determined Sophocles Zoullas's compensation in consultation with Steven Hall. *See* June 5, 2008 Minutes of the Compensation Committee of Eagle Bulk Inc. at EB000008714 (Bongiorno Decl. Ex. K).

36. Sophocles Zoullas did not participate in setting his own compensation. S. Zoullas Dep. 132:5-11; Cianciolo Dep. 181.

37. Sophocles Zoullas received an annual salary from Eagle and periodic cash bonuses in recognition of Mr. Zoullas's achievements. *See* June 19, 2008 Employment Agreement Between Eagle Bulk Shipping Inc. and Sophocles N. Zoullas ("2008 Zoullas Employment Agreement") (Bongiorno Decl. Ex. L).

38. Eagle's executive compensation model was designed to tie compensation to the executive's personal achievements and Eagle's achievements.

39. The Board, in conjunction with Steven Hall, determined that Sophocles Zoullas was, and continues to be, of central importance to Eagle, and that Eagle's business would suffer if Mr. Zoullas left the company. December 12, 2008 Steven Hall and Partners Opinion Letter on Executive Compensation ("December 12, 2008 Steven Hall Opinion Letter") at EB000020957-EB000020960 (Bongiorno Decl. Ex. M)..

40. The Eagle Board approved cash bonuses for Sophocles Zoullas in recognition of his successful efforts to steer Eagle through the financial crisis, as well as in the interest of retention. Hall Dep. 81:18-25; 100:24-25; 101:2-9.

41. Under Mr. Zoullas's guidance, the Company was able to avoid defaulting on its loan obligations and also to maintain a steady stream of charters for its ships. Ginsberg Dep. 20:15-25; 21:2-21; S. Zoullas Dep. 185:5-16, 21-25; 186:2-3, 7-17.

42. The compensation committee determined that Eagle's performance was exceptional given the state of the industry and as compared to competitors. Cianciolo Dep. 156:1-25; 157:10-21; December 12, 2008 Steven Hall Opinion Letter at EB000020958.

43. Steven Hall "concur[red] with the Board that the accomplishments of Mr. Zoullas in 2008 are extraordinary when viewed based on their impact on the Company and compared with other comparators." *Id.* at EB000020960.

44. Despite the downturn in the shipping industry, Eagle managed to attain 26% growth in the company. Cianciolo Dep. 161:17-22; December 20, 2010 Steven Hall and Partners Opinion Letter on Executive Compensation ("December 20, 2010 Steven Hall Opinion Letter") at EB000015801-EB000015805 (Bongiorno Decl. Ex. N).

45. Sophocles Zoullas successfully renegotiated eight existing contracts with Chinese shipping firms to keep Eagle solvent during the industry downturn. Ginsberg Dep. 20:15-25; 21:2-21.

46. Through Sophocles Zoullas's work, Eagle also managed to preserve $47.4 million in deposits on shipbuilding contracts which would be applied to ongoing construction. *See* April 27, 2009 Email from Jon Tomasson to Sophocles Zoullas, Joseph Cianciolo, David Hiley, Doug Haensel, Alexi Zoullas, and Forrest Wylie RE: Tradewinds story ("Tomasson Email) at EB000005463-EB000005466 (Bongiorno Decl. Ex. O); December 12, 2008 Steven Hall Opinion Letter at EB000020958.

47. Sophocles Zoullas renegotiated eight new ship-building contracts into options which reduced Eagle's capital commitments by $316 million, while still preserving the ability to retain ships if the market improved. December 12, 2008 Steven Hall Opinion Letter at EB000020958-EB000020959.

48. Sophocles. Zoullas negotiated to postpone the delivery of a ship due in September, 2009 to the fourth quarter of 2010, which reduced the economic risk to Eagle of a significant non-productive asset. *Id.*

49. Sophocles. Zoullas negotiated with the Royal Bank of Scotland to modify Eagle's loan facility, which helped prevent Eagle from defaulting on its loan covenants. *See* December 12, 2008 Steven Hall Opinion Letter at EB000020959, Tomasson Email at EB000005465-EB000005466.

50. Despite the difficult economic environment, Eagle was one of the few dry-bulk shipping companies to turn a profit in the fourth quarter of 2008. *See* Tomasson Email at EB000005466.

51. Sophocles Zoullas also received compensation in the form of equity in Eagle. *See* 2008 Zoullas Employment Agreement.

52. Sophocles Zoullas received 866,000 restricted stock units for signing a new employment contract, and the Complaint assigns a value to those units in excess of $24,000,000 based on then-current market price of the units. *Id.*; Compl. ¶ 42.

53. Those units had a five-year vesting period, and have actually vested with much lower market values.

54. The same is true of all of Sophocles. Zoullas's other equity compensation.

55. In 2011, pursuant to Sarbanes Oxley requirements, Eagle held a non-binding "say on pay" vote. *See* Eagle Bulk Shipping, Inc., Form 8-K (filed June 20, 2011). The compensation was approved in 2011 by shareholders. *Id.*

### III. FACTS CONCERNING DIRECTOR COMPENSATION

56. The full Board of Directors was required to approve Director compensation packages. Haensel Dep. 62:2-5; January 15, 2008 Board Minutes of Eagle Bulk Shipping Inc., ("January 15, 2008 Board Minutes") at EB000011583 (Bongiorno Decl. Ex. P); January 23,

2009 Board Minutes of Eagle Bulk Shipping Inc., at EB000011666-EB000011667 ("January 23, 2009 Board Minutes") (Bongiorno Decl. Ex. Q).

57. In 2007, Eagle had only two senior executives, CEO Sophocles Zoullas, and CFO Alan S. Ginsberg. *See* Eagle Bulk Shipping, Inc., April 23, 2007 Form DEF 14A Proxy Notification, at 11.

58. Mr. Zoullas's and Mr. Ginsberg's responsibilities increased after Kelso sold its interest in Eagle, and as Eagle acquired additional ships and hired more personnel.

59. As a result of their increased responsibilities and Eagle's growth, Eagle's Executives sought frequent guidance from Eagle's Directors. S. Zoullas Dep: 212-213.

60. In early 2008, and after consulting with Steven Hall, the Board adopted a system whereby Directors would receive yearly retainers plus additional fees for each meeting attended.

61. The purpose of the compensation system was to tie Director compensation to the time committed by Eagle's Directors. *See* January 20, 2009 Steven Hall & Partners Opinion Letter on Director Compensation ("January 20, 2009 Steven Hall Opinion Letter"), at EB000011496 (Bongiorno Decl. Ex. R).

62. In the years that followed, the Board, after consulting with Steven Hall, adjusted fee amounts, but the basic structure that Plaintiffs challenge (yearly fee plus meeting fees) remained. January 23, 2009 Board Minutes at EB000011666-EB000011667; January 15, 2008 Board Minutes; February 24, 2010 Steven Hall & Partners Opinion Letter on Director Compensation ("February 24, 2010 Steven Hall Opinion Letter') (Bongiorno Decl. Ex. S); January 20, 2009 Steven Hall Opinion Letter at EB000011496.

63. During all relevant time periods, Eagle had seven directors serving on Eagle's Board of Directors. *See, e.g.,* December 10, 2008 Board Minutes of Eagle Bulk Shipping Inc. (Bongiorno Decl. Ex. T).

64. Following Kelso's sale of Eagle stock, five of Eagle's Board Members were non-employee outside directors (Messrs. Wiley, Haensel, Cianciolo, Hiley, and Tomasson). *Id.*

65. Eagle's Corporate Governance Guidelines required that the Board have a "majority of directors who meet the criteria for independence required by the NASDAQ Marketplace Rules." *See* Corporate Governance Guidelines Of Eagle Bulk Shipping Inc. § I.2 (Bongiorno Decl. Ex. U).

66. During all relevant time periods, Joe Cianciolo was an Outside Director at Eagle. Mr. Cianciolo served as the Chair of Eagle's Audit Committee. Prior to serving on the Eagle Board of Directors, Mr. Cianciolo was a partner at the tax firm KPMG LLP and served as the managing partner of KPMG's Providence, RI office at the time of his retirement. Cianciolo Dep. 6, 10:5-13.

67. During all relevant time periods, Douglas Haensel was an outside Director at Eagle. Mr. Haensel is the founder and managing partner of Haensel Capital Partners, LLC, an investment firm specializing in venture capital and other private investments. Prior to founding Haensel Capital Partners, Mr. Haensel served as Chief Financial Officer of Burt's Bees, Inc. and Chief Operating Officer at 21st Century Newspapers, Inc. Haensel Dep. 6:17-25, 8.

68. During all relevant time periods, David Hiley was an outside Director at Eagle. Mr. Hiley is an experienced financial consultant and former head of investment banking at a large securities firm. Mr. Hiley also served as Executive Vice President and Chief Financial Officer of CRT Properties, a real estate investment trust. See Eagle Bulk Shipping Inc., Director

Hiley Biography, http://www.eagleships.com/phoenix.zhtml?c=189576&p=irol-govBio&ID=139397 (last visited April 1, 2013).

69. Thomas Winmill joined the Eagle Board in 2010. Mr. Winmill is the President and CEO of Winmill & Co. Incorporated and its affiliates, which include SEC-registered investment advisers and broker/dealers, SEC-registered investment companies, and a U.S. Department of Housing and Urban Development licensed mortgage banker. Eagle Bulk Shipping Inc., Director Winmill Biography, http://www.eagleships.com/phoenix.zhtml?c=189576&p=irol-govBio&ID=187032 (last visited April 1, 2013).

70. During all relevant time periods, Jon Tomasson was an outside Director at Eagle. Mr. Tomasson serves as the chair of Eagle's Compensation Committee. Mr. Tomasson is the founder and Chief Executive Officer of Vinland Capital Investments, LLC, a real estate investment company. Mr. Tomasson was previously a principal with Cardinal Capital Partners and a manager in Citigroup's Global Real Estate Equity and Structured Finance business. Eagle Bulk Shipping Inc., Director Tomasson Biography, http://www.eagleships.com/phoenix.zhtml?c=189576&p=irol-govBio&ID=164610 (last visited April 1, 2013).

71. Steven Hall assessed the Board's compensation in January 2008 and found it to be fair and reasonable. January 15, 2008 Board Minutes at EB0000115583.

72. Sophocles Zoullas relied heavily on the Board's advice and frequently spoke with directors outside of regular board meetings. January 20, 2009 Steven Hall & Partners Opinion Letter at EB000011496.

73. The state of the dry bulk shipping industry required frequent board meetings to manage the numerous transactions that were key to Eagle's success.  Cianciolo Dep. 143:16-22.

74. Directors met and communicated with Eagle's Executives frequently in order to assist with challenges to Eagle's business during the difficult economic environment.  Hall Dep. 193:22-25; 194:1-5.

75. Beginning in 2008, the number of Board and Committee meetings increased.

76. Directors also participated in frequent telephone calls with management outside of meetings.  Cianciolo Dep. 59-60.

77. Eagle's Directors offered advice to management on many issues, including capital markets, finance, accounting, relations with banks, and other matters.  January 20, 2009 Steven Hall Opinion Letter at EB000011496; Cianciolo Dep. 59:6-25.

78. The Directors' commitment to Eagle's success required more time and dedication than was typical in the industry.  Hall Dep. 188:21-25, 189:2-6.

79. Steven Hall provided assessments of the Board's compensation in 2008, 2009, and 2010 and found each time that the compensation was fair and reasonable.  January 15, 2008 Board Minutes at EB000011583; January 20, 2009 Steven Hall Opinion Letter at EB000011496; February 24, 2010 Steven Hall Opinion Letter at EB000009638.

80. Sophocles. Zoullas also frequently relied on Directors' advice when determining the best method of protecting Eagle's interests.  Hall Dep. 192:20-23.

81. Steven Hall determined that compensation for the Board was reasonable given the Directors' level of commitment to the company.  January 20, 2009 Steven Hall Opinion Letter at EB000011496.

82. In addition, the Board's decision to increase director compensation was consistent with prevailing trends, as director pay in general began to increase significantly in 2005 as a result of improved market conditions and Sarbanes/Oxley legislation. Hall Dep. 27:15-22.

83. Sophocles. Zoullas frequently sought the Board's advice in determining how to best position Eagle to respond to the turbulent economy. February 24, 2010 Steven Hall Opinion Letter at EB000009638.

84. Steven Hall determined that the Board's compensation was fair and reasonable because it reflected a time commitment exceeding what is normally expected from independent directors. *Id*.

85. Steven Hall further determined that the Board's compensation was fair and reasonable because Eagle was likely to face ongoing challenges that would continue to require close, hands-on attention from the Board. *Id*.

VI. **FACTS CONCERNING THE CHALLENGED DELPHIN TRANSACTION**

86. In early 2009, Kelso approached Eagle with a potential business opportunity. S. Zoullas Dep. 27-29.

87. Kelso proposed to form a company called Delphin that would purchase ships in the distressed shipping market, and then operate them. *Id.*

88. Kelso proposed that Eagle would manage Delphin's shipping fleet in exchange for a fee.

89. Kelso proposed that Sophocles Zoullas serve as non-executive chair of Delphin and to have a profit interest therein. Haensel Dep. 129:2-7

90. On February 4, 2009, Mr. Zoullas presented Kelso's proposal to the Eagle Board. February 4, 2009 Board Minutes of Eagle Bulk Shipping Inc. ("February 4, 2009 Board Minutes") at EB000011668 (Bongiorno Decl. Ex. V).

91. The Board recognized that Mr. Zoullas's proposed role with Delphin would present a conflict of interest. *Id.*; Haensel Dep. 128:22-25; 129:2-11

92. The Board recognized that several Directors who held investments in Kelso would also have a conflict of interest in the transaction. Eagle Bulk Shipping Inc. Board of Directors Procedures Relating to Potential Conflicts of Interest Involving NewCo Shipping (Bongiorno Decl. Ex. W) at EB000018661-EB000018663; February 4, 2009 Board Minutes at EB000011668-EB000011669.

93. The Board created a committee of three independent Directors to consider the proposed Delphin transaction (Messrs. Tomasson, Cianciolo, and Haensel) who had no interest in Kelso (the "Delphin Conflicts Committee"). Cianciolo Dep. 116; February 4, 2009 Board Minutes.

94. From that point forward, the Delphin Conflicts Committee handled all matters relating to Delphin, including determining whether to enter into any relationship with Delphin, and managing that relationship. Cianciolo Dep. 124-27.

95. In the months that followed, the Delphin Conflicts Committee considered Kelso's proposal, and negotiated with Kelso. *See* February – July 2009 Minutes of the Meetings of the Special Committee of the Board of Directors of Eagle Bulk Shipping, Inc. ("Delphin Conflicts Committee Minutes") (Bongiorno Decl. Ex. X).

96. The Delphin Conflicts Committee met on at least 15 occasions. *See id.*

97. They received advice from counsel, Seward and Kissel, concerning the proposed transaction. *See, e.g.*, July 7, 2009 Minutes of the Meeting of the Board of Directors of Eagle Bulk Shipping Inc. ("July 7, 2009 Board Minutes") at EB000011697-EB000011699 (Bongiorno Decl. Ex. Y); June 2009 Memorandum to Conflicts Committee of Eagle Bulk Shipping, Inc. ("Delphin Opinion Letter") at Supp. EB000469 (Bongiorno Decl. Ex. Z).

98. Seward and Kissel opined that the committee, in exercising its fiduciary duties, exceeded the requirements of Marshall Islands law in dealing with potential conflicts relating to the Delphin transaction. Delphin Opinion Letter at Supp. EB000469.

99. Seward and Kissel further advised the Committee that Delphin's proposed limited liability agreement did not require Sophocles Zoullas to favor Delphin's interests over Eagle's, and that the Committee negotiated the transaction in a manner that exceeded its obligations under Marshall Islands law. *Id.* at Supp. EB000469-EB000470.

100. Ultimately, the Committee determined to enter into a Management Agreement with Delphin whereby Eagle would manage Delphin ships in exchange for a monetary fee. *See* July 7, 2009 Board Minutes at EB000011697-EB000011698.

101. The amount that Eagle would receive was in excess of arm's length market rates for ship management. S. Zoullas Dep. 38:25, 39:2-11

102. Eagle already had the capacity and staffing to manage Delphin's ships without incurring additional costs. *See* Delphin Opinion Letter at Supp. EB000468.

103. Moreover, it did not require Eagle to hire any additional staff. S. Zoullas Dep. 38:18-24

104. The deal was structured so that Eagle could leverage its existing excess management capacity for virtually no cost. S. Zoullas Dep. 42:4-10.

105. The Management Agreement included provisions to address potential conflicts among Eagle, Delphin and Mr. Zoullas.

106. Eagle received a right of first refusal to any ships that Delphin sought to purchase. Cianciolo Dep. 126:8-12; July 1, 2009 Minutes of Meeting of the Delphin Conflicts Committee at EB000011692.

107. Further, Eagle retained a right of first refusal over any charters. Cianciolo Dep. 128:10-18; July 1, 2009 Minutes of Meeting of the Delphin Conflicts Committee at EB000011692.

108. In addition, Eagle would receive a percentage of any transaction whenever Delphin bought or sold a ship. Cianciolo Dep. 164:22-24.

109. The Conflicts Committee determined that there was no risk of Delphin ships competing with Eagle's ships and continued to monitor transactions to ensure no competition occurred. Ginsberg Dep. 117:7-10.

110. Eagle saw its first profit from the Delphin agreement in the fourth quarter of 2010. Ginsberg Dep. 89:3-6.

111. By managing ship purchase transactions for Delphin, Eagle management gains valuable visibility into the ship purchasing market.

112. As a result of its larger market footprint, Eagle has been able to negotiate favorable rates on everything from ship lubricant to provisions.

113. Sophocles Zoullas has a 1.2% interest in Delphin. S. Zoullas Dep. 22:9-12.

V.   **FACTS CONCERNING THE LITIGATION**

- 16 -

114. During discovery, Plaintiffs took seven depositions, including Eagle executives Alexis Zoullas, Sophocles Zoullas and Alan Ginsberg, non-Executive Directors Joseph Cianciolo and Douglas Haensel, and compensation consultant Mr. Steven Hall.

Dated: April 1, 2013

Respectfully submitted,

Wilmer Cutler Pickering Hale and Dorr LLP

By: /s/ Michael G. Bongiorno
Michael G. Bongiorno
Shauna K. Friedman
399 Park Avenue
New York, New York 10022
Tel.: 212-230-8800
Fax: 212-230-8888

*Attorneys for Defendants Douglas P. Haensel, Jon Tomasson, Joseph M. Cianciolo, David B. Hiley, Thomas B. Winmill, and Forrest E. Wylie.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **"Outside Directors' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment"** was filed this 1st day of April, 2013, via this Court's CM/ECF filing system, which gives electronic notice to all parties registered to receive such notice. In addition, the foregoing, the Declaration of Michael G. Bongiorno in Support of Motion for Summary Judgment, and the attached Exhibits filed under seal were delivered to Plaintiffs' Counsel via email and via courier.

/s/ Michael G. Bongiorno
Michael G. Bongiorno
399 Park Avenue
New York, New York 10022
Tel.: 212-230-8800
Fax: 212-230-8888